CHARLES D. GIANETTI *v.* DAVID RUTKIN ET AL.
(AC 34045)

DiPentima, C. J., and Lavine and Beach, Js.

642

Submitted on briefs November 30, 2012—officially released May 21, 2013

*David Rutkin* filed a brief for the appellants (defendants).

*Charles D. Gianetti*, pro se, the appellee (plaintiff), filed a brief.

*Opinion*

BEACH, J. This case raises the spectre of "balance billing," a practice by which the health care provider seeks to recover from the patient the difference between the self-determined value of the provider's services and the amount provided for in the contract between the provider and the health maintenance organization. Although balance billing generally has not been countenanced,[1] in this case the physician had no contractual arrangement with the patient's health insurer. Because of this distinction, we affirm the judgment of the trial court in favor of the health care provider.

The facts of this case, as found by the trial court, are as follows. On August 8, 1999, the plaintiff, Charles D. Gianetti, a plastic surgeon, treated the defendant, David

---

[1] See, e.g., *Gianetti* v. *Blue Cross & Blue Shield of Connecticut, Inc.*, United States District Court, Docket No. 3:07cv01561 (PCD), 2008 WL 1994895 (D. Conn. May 6, 2008), aff'd, 351 Fed. Appx. 520 (2d Cir. 2009); *Gianetti* v. *Siglinger*, Superior Court, judicial district of Fairfield, Docket No. CV-98-0349830 (April 26, 2004) (36 Conn. L. Rptr. 869), aff'd, 279 Conn. 130, 900 A.2d 520 (2006); *State* v. *Gianetti*, Superior Court, judicial district of Fairfield, Docket No. CV-04-000594-S (January 11, 2005) (38 Conn. L. Rptr. 524).

Rutkin,[2] in the emergency department at St. Vincent's Medical Center (St. Vincent's). Rutkin was insured by Physician Health Services (insurer), a managed health care plan. According to Rutkin's testimony, St. Vincent's was within the insurer's network of providers. At the time Gianetti treated Rutkin, however, Gianetti had no contractual relationship with the insurer.[3] Gianetti testified that he did not inform Rutkin at St. Vincent's that he was not a participating provider. After his emergency treatment, Rutkin had two follow-up visits with Gianetti, the first on August 13, 1999, and the second on March 7, 2000.

At the August 13, 1999 appointment, Rutkin completed a "New Patient Information" form provided by Gianetti. Rutkin filled out the form, providing his name, address, social security number, employer, spouse's name and insurance information. Rutkin also signed and dated the following statement: "I hereby authorize

[2] David Rutkin and his wife, Elizabeth Rutkin, are both defendants in this action and will be referred to collectively, where appropriate, as the Rutkins. For convenience, we refer to David Rutkin as Rutkin.

[3] Literature regarding balance billing states that it is not uncommon for patients to be treated by out-of-network physicians in a network hospital's emergency department. See J. Hoadley et al., "Unexpected Charges: What States Are Doing About Balance Billing," California Healthcare Foundation (April, 2009), p. 5, available at http://www.chcf.org/~/media/MEDIA%20 LIBRARY%20Files/PDF/U/PDF%20UnexpectedChargesStatesAndBalance Billing.pdf (last visited May 8, 2013); see also J. Gold et al., "Reimbursement for Emergency and Non-Emergency Services Provided by Out-of-Network Physicians: The Issue of Balance Billing," 8 ABA Health eSource (November, 2011), available at http://www.americanbar.org/content/newsletter/publica tions/aba_health_esource_home/aba_health_law_esource_1111_gold.html (last visited May 8, 2013) (even in participating hospital, "[c]ertain emergency services, or indeed all professional services in the emergency department, may be provided by out-of-network, or non-participating physicians"). Some hospitals have addressed this issue by requiring hospital based physicians to contract with all the insurance carriers with which the hospital is affiliated. Others inform patients upon admission that some physicians may not be within the patient's network and that the patient may be financially responsible for some services provided during their stay. See J. Gold et al., supra.

Charles D. Gianetti, M.D. to furnish information to insurance carriers concerning my illness [and] treatments. I understand that I am responsible for the payment of all fees regardless of insurance. In the event that payment of such fees is not made by me, I will be responsible for any reasonable costs of collection, including attorney['s] fees."

Gianetti did not seek payment from Rutkin's insurance carrier. At some point, Gianetti informed Rutkin that he was not a provider within the network of Rutkin's insurer. Accordingly, on or about January 24, 2000, Gianetti sent a bill to Rutkin in the amount of $8785, which represented his fees for the emergency department treatment and the August, 1999 follow-up appointment. At Rutkin's March, 2000 appointment with Gianetti, Rutkin was presented with a copy of that bill. Gianetti advised Rutkin to submit the bill to his insurer. The bill never was submitted to the insurer, and Rutkin received overdue bill notices from Gianetti in May and June, 2000; in July, 2000, Rutkin received a final bill notice.

Despite receiving these notices that the bill was delinquent, Rutkin did not submit a claim to his insurer or otherwise inquire as to whether his insurer would cover any of the services provided by Gianetti. Rutkin did request that Gianetti submit a claim to his insurer; Gianetti did not do so.

Almost three years later, on or about May 28, 2003, Gianetti sent another copy of the January 24, 2000 bill to Rutkin; this bill also included a $160 charge for the March, 2000 visit. The total charges were thus $8945.[4] Upon receiving the bill, Rutkin wrote a note on the bottom of it and sent it back to Gianetti. The note said: "I went to a hospital that accepted PHS Health

___

[4] The reasonableness of Gianetti's fees was not contested by the Rutkins at trial or on appeal.

Insurance. If you were not an approved PHS [d]octor why did they send you? That's why we had health [i]nsurance. This is not my problem, I'm sorry."

On or about May 27, 2005, Gianetti commenced this action, alleging breach of contract and quantum meruit. Gianetti also alleged that Rutkin's wife, Elizabeth Rutkin, was jointly liable for the outstanding medical bills pursuant to General Statutes § 46b-37 (b). The Rutkins answered the complaint, denying the material allegations, and pleaded the special defense of estoppel to all counts. The Rutkins additionally alleged in a counterclaim that Gianetti had violated, inter alia, General Statutes §§ 20-7f (b) and 42-110a et seq., the Connecticut Unfair Trade Practices Act (CUTPA).

The case was tried to the court. The court concluded that Gianetti had proved both counts of his complaint. Regarding the first count, the court found that the "New Patient Information" form signed by Rutkin created a contract between Rutkin and Gianetti for the services provided at the two follow-up visits. Rutkin breached this contract by failing to pay, entitling Gianetti to $320 in damages. As to the second count, no express contract existed at the time that Gianetti provided emergency treatment to Rutkin at St. Vincent's; however, the court found that Gianetti was entitled to compensation in the amount of $8625 under the doctrine of quantum meruit. The court also found that, pursuant to § 46b-37 (b), Elizabeth Rutkin was jointly liable for the costs of her husband's medical care. The court then rejected the special defense of estoppel and both counterclaims. The court rendered judgment in favor of the plaintiff. This appeal followed. Additional facts will be set forth as necessary.

I

We first address the Rutkins' claim that the court erred in holding that Gianetti was owed reasonable

compensation under the doctrine of quantum meruit for services he provided to Rutkin in the St. Vincent's emergency department. The Rutkins essentially argue that the application of quantum meruit was inequitable because, at the time of the initial—and most costly part of—treatment, Rutkin assumed that all of the health care providers at the hospital who treated him would be contractually related with his insurer. We disagree.

"Literally translated, the phrase quantum meruit means as much as he deserved. Quantum meruit is a liability on a contract implied by law. . . . It is premised on the finding of an implied promise to pay the plaintiff as much as he reasonably deserves, and it is concerned with the amount of damages resulting from an implied promise by the defendant to pay." (Citation omitted; internal quotation marks omitted.) *Derr* v. *Moody*, 5 Conn. Cir. Ct. 718, 721–22, 261 A.2d 290 (1969); see 42 C.J.S. 31, Implied Contracts § 25, p. 31 (2007) ("[t]o receive damages in quantum meruit, a party must show that valuable services were rendered or materials furnished to the person sought to be charged, which were accepted and used by such person, and under circumstances that would give reasonable notice that the provider expected payment"). "An implied contract would arise if the plaintiff rendered services, at the request of the defendant, under an expectation that they were to be paid for and if the defendant either intended to pay for them or the services were rendered under such circumstances that the defendant knew, or, as a reasonable person, should have known, that the plaintiff did expect payment." *Butler* v. *Solomon*, 127 Conn. 613, 615, 18 A.2d 685 (1941). Put another way, "[t]he question in such a case is not whether the defendant *in fact expected to pay for the services* . . . ." (Emphasis added.) Id., 616.

"A determination of a quantum meruit claim requires a factual examination of the circumstances and of the

conduct of the parties . . . that is not a task for an appellate court [but rather for the trier of fact]. . . . This court may reject a factual finding if it is clearly erroneous, in that as a matter of law it is unsupported by the record, incorrect, or otherwise mistaken." (Internal quotation marks omitted.) *Schreiber* v. *Connecticut Surgical Group, P.C.*, 96 Conn. App. 731, 737, 901 A.2d 1277 (2006).

The court's findings were not clearly erroneous. The court found that Gianetti "performed services with the expectation that he was to be paid and [Rutkin] knew or should have known of this expectation. The fact that [Rutkin] anticipated that the payment would be made by his insurance carrier does not eliminate his liability under the doctrine of quantum meruit."

The court reasonably concluded that a reasonable person in Rutkin's circumstances ought to have known that medical services ordinarily are not provided gratuitously, and that he would be expected to pay for the services, either personally or through his insurance, depending on the network status of the health care providers who treated him at St. Vincent's. The Rutkins fault Gianetti for not apprising them earlier that he was not in their insurer's network and, therefore, that he would be seeking compensation directly from them. Whether Rutkin actually intended to pay for the services out of pocket, however, is not the point. Rather, the issue is whether Gianetti's services were rendered under such circumstances that a reasonable person would have anticipated personal liability if the care was not covered by his insurance carrier. See *Butler* v. *Solomon*, supra, 127 Conn. 616; cf. 42 C.J.S., supra, § 27, p. 33 ("a court need not find that [the] defendant intended to compensate the plaintiff for the services rendered or that the plaintiff intended that the defendant be the party to make compensation").[5] Thus, the

[5] It has been well documented that not all hospital based physicians participate in all of the insurance networks in which their hospitals

court's finding, that both sides knew that services were rendered with an eye to payment, was not clearly erroneous.[6]

## II

We next address the Rutkins' claim that the court erred by holding that § 20-7f (b) prohibits "balance billing" patients only for services rendered by in-network providers. The court reached this conclusion as to the statute's scope by noting that § 20-7f (b) precludes a "health care provider [from] request[ing] payment from an enrollee, other than a copayment or deductible, for medical services covered under a managed care plan." (Internal quotation marks omitted.) The court further observed that to " 'request payment' " is defined as, among other things, submitting a bill to an enrollee for services " 'not actually owed.' " This language, the court stated, leads to the conclusion that it is an unfair trade practice to request billing from an enrollee only when

participate. See, e.g., R. Rabin, "WELL; Out-of-Network Bills for In-Network Health Care," New York Times, November 20, 2012, available at http://query.nytimes.com/gst/fullpage.html?sec=health&res=9E07EED81438-F933A15752C1A9649D8B63&smid=pl-share (last visited May 8, 2013) (cautioning consumers that "[d]octors who don't participate in your network may work at [an in-network hospital]"); A. Matthews, "Surprise Health Bills Make People See Red," Wall Street Journal, December 4, 2008, available at http://online.wsj.com/article/SB122834911902477643.html ("[c]onsumers also may be billed after visiting in-network hospitals if they received treatment from medical providers who work there but don't participate in the same health plans") (last visited May 8, 2013).

[6] There was no evidence presented at trial as to whether Rutkin's insurer would have paid for Gianetti's emergency department services. Literature on balance billing states that some insurance companies have paid a percentage of emergency services provided by out-of-network providers. See W. Konrad, "Avoiding Surprise Bills With Homework and Negotiation," New York Times, April 30, 2010, available at http://www.nytimes.com/2010/04/30/health/01patient.html (last visited May 8, 2013); see also *Gianetti* v. *Fortis Ins. Co.*, Superior Court, judicial district of Fairfield, Docket No. CV-03-0403193-S (March 29, 2007) (noting that Gianetti was not preferred provider within defendant's insurance network, but insurer still paid reasonable and customary fee for services).

the provider is within the plan's network. In those cases, the patient is not liable for any costs, except for copayments and deductibles; thus, the bill is " 'not actually owed' " by the enrollee.[7] We agree with the court.

We must determine whether Gianetti's direct billing of Rutkin was permissible under § 20-7f (b). Statutory construction is a "[question] of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning, [we first consider] the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Cornelius* v. *Rosario*, 138 Conn. App. 1, 8, 51 A.3d 1144, cert. denied, 307 Conn. 934, 56 A.3d 713 (2012).

Section 20-7f addresses balance billing. Typically, "[b]alance billing [occurs] when a provider seeks to

---

[7] In support of its construction of § 20-7f, the court also noted, parenthetically, that the statute was revised editorially in 2003, so that it no longer appeared to apply to physicians and surgeons. See Revisor's note to General Statutes (Rev. to 2011) § 20-7f ("[i]n 2003 a reference in Subsec. [a] [2] to 'chapters 370 to 373 . . .' was changed editorially by the Revisors to 'this chapter, chapters 371 to 373 . . .' "). In the 2013 General Statutes, the Revisors noted that the 2003 revision excluding chapter 370 was an error and, accordingly, restored the language in the statute, which made it applicable to physicians and surgeons, as originally drafted in Public Acts 1998, No. 98-163.

collect from [a managed care organization] member the difference between the provider's billed charges for a service and the amount the [managed care organization] paid on that claim." See J. Hoadley et al., "Unexpected Charges: What States Are Doing About Balance Billing," California Healthcare Foundation (April, 2009), p. 3, available at http://www.chcf.org/~/media/MEDIA%20LIBRARY%20Files/PDF/U/PDF%20UnexpectedChargesStatesAndBalanceBilling.pdf (last visited May 8, 2013). Managed care organization members generally face balance billing only when treated by an out-of-network provider. Id., 4. This is because "most privately insured people are covered by [a managed care organization], which contracts with a network of providers to offer medical services to members. In return, providers agree to deliver services at a negotiated rate that is generally below their usual charges. Providers also agree to 'hold harmless' (i.e., not to balance bill) members for the difference between the contracted rate and their typical billed charge. This benefits providers by offering a steady flow of insured patients for whom they are paid promptly and directly by the [managed care organization]." Id., 3.

In Connecticut, balance billing is prohibited not only by the contracts between providers and insurers, but also by statute. See General Statutes § 20-7f. The question we must resolve is whether Connecticut's statutory prohibitions on balance billing extend to health care providers that are "out-of-network." We hold that they do not.[8]

---

[8] Some states do prohibit or otherwise regulate balance billing even when medical care is provided by an out-of-network provider. See J. Hoadley et al., supra, p. 6. These protections vary from state to state. Id. In California, for example, the state's Supreme Court has held that it is illegal to balance bill an HMO member who receives emergency treatment, regardless of whether the emergency medical provider has a contract with that patient's HMO. See *Prospect Medical Group* v. *Northridge Emergency Medical Group*, 45 Cal. 4th 497, 502, 198 P.3d 86, 87 Cal. Rptr. 3d 299 (2009) ("[B]illing disputes over emergency medical care must be resolved solely between the emergency room doctors, who are entitled to a reasonable payment for

Pursuant to § 20-7f (b), it is "an unfair trade practice in violation of chapter 735a for any health care provider to request payment from an enrollee, other than a copayment or deductible, for medical services covered under a managed care plan." " 'Request payment' includes, but is not limited to, submitting a bill for services not actually owed or submitting for such services an invoice or other communication detailing the cost of the services that is not clearly marked with the phrase 'This is not a bill.' " General Statutes § 20-7f (a) (1). Read in isolation, § 20-7f (b) plausibly could be interpreted as prohibiting a health care provider from requesting payment, other than a copayment or deductible, from any patient with health insurance, regardless of whether the provider is under contract with the patient's insurer. Thus, we next consider the context provided by related statutes. See *Cornelius* v. *Rosario*, supra, 138 Conn. App. 8. As the court noted, § 20-7f was passed as a part of Public Acts 1998, No. 98-163. See Public Acts 1998, No. 98-163, § 1. Review of the other provisions of Public Act 98-163 is instructive in determining the scope of § 20-7f (b).

Section 2 of Public Act 98-163, codified in General Statutes (Rev. to 1999) § 38a-193 (c), delineated provisions that must be included in every contract "between a health care center and a *participating provider* . . . ." (Emphasis added.) Section 38a-193 (c) provides in relevant part that the contract between a health care center and a participating provider must contain language stating that it is an unfair trade practice "(3) . . . for any health care provider to request payment from an enrollee, other than a copayment or deductible, for covered medical services, or to report to a credit reporting agency an enrollee's failure to pay a bill for medical services when a health care center has primary

their services, and the HMO, which is obligated to make that payment. A patient who is a member of an HMO may not be injected into the dispute.").

responsibility for payment of such services."[9]  The fact
that the balance billing prohibitions in § 20-7f (b) are
necessary components of the contracts between insur-
ers and participating providers suggests that § 20-7f (b)
does not apply to out-of-network providers who are,
by definition, not in contractual relationships[10] with
insurers.

Not only did Public Act 98-163 prohibit balance bill-
ing, it also attempted to address one of the root motiva-
tions for balance billing—slow payment of claims by
health insurers.  Section 3 of Public Act 98-163
addressed this problem by expressly setting forth time
limits for the payment or reimbursement of health care
providers and by imposing a penalty of 15 percent inter-
est per year when timely payment is not made. See
General Statutes (Rev. to 1999) § 38a-816 (15).

We hold, then, that § 20-7f (b) is unambiguous when
read in its context. Although it is not necessary for the
determination of the statute's scope, legislative history
reinforces our conclusion that the statute's prohibitions
apply only to health care providers in contractual rela-
tionships with the patient's insurance carrier.[11] When

[9] The cited passage from § 38a-193 (c) (3) reflects the current revision of
the statute. The cited language was added to § 38a-193 (c) (3) by Public
Acts 2007, No. 07-178, § 1. The substance of the statute, as established by
Public Act 98-163—that balance billing must be prohibited in the contracts
between insurers and participating providers—was not changed by this
revision.

[10] To limit the amount a provider may charge for services, when such
limitation has neither been agreed to by the provider nor clearly regulated
by law, is problematic. Statutes ought to be construed to avoid constitutional
issues, if possible. See *Sanzone* v. *Board of Police Commissioners*, 219
Conn. 179, 187, 592 A.2d 912 (1991) (in construing statutes, court must
presume that legislature "intended a reasonable, just and constitutional
result"); but see *State* v. *Courchesne*, 262 Conn. 537, 561, 816 A.2d 562 (2003).

[11] One remark summarizing the intent of the bill is particularly illuminating:
"So this [bill] would make it an unfair [trade] practice if [health care provid-
ers] . . . [b]ill people . . . for services which . . . are already *contracted*
for by insurance companies to pay the full bill." (Emphasis added.) 41 H.R.
Proc., Pt. 9, 1998 Sess., p. 2806.

the bill was being debated in the Joint Standing Committee on Public Health, providers testified that they would send statements—not bills—to patients because their insurers were not promptly paying claims. See Conn. Joint Standing Committee Hearings, Public Health, Pt. 5, 1998 Sess., pp. 1585–86. Legislators expressed concern that these statements may have been confusing to patients, who assumed they were bills. The providers testified that the statements were sent in the hope that patients would contact their insurance carriers and inquire as to the why the providers had not yet been promptly compensated. See id. As one physician noted, "[i]f the HMOs would pay the proper amount in a timely fashion there would be no need [to send statements to patients]." Id., p. 1587.

The context provided by Public Act 98-163 thus demonstrates that § 20-7f (b) was intended to address balance billing by network providers. By requiring contracts between insurers and participating providers to prohibit balance billing of *enrollees* and providing for the prompt payment of claims, the act took steps to ensure that enrollees would not be billed for services that their insurers were contractually obligated to cover. It is also worth noting that, if § 20-7f were to apply to out-of-network providers, the statute does not address how providers and insurers would negotiate the appropriate fee to be paid to the provider for a particular service. This omission further demonstrates that § 20-7f (b) applies only to network providers, who contractually set their rates with the insurers with which they are affiliated.

The Rutkins' claim also fails for a simpler reason. Section 20-7f (b) prohibits balance billing for medical services "covered under a managed care plan." Here, neither party submitted the bill for payment by the Rutkins' insurer, and the court found that evidence as to whether the insurer would have paid the bill, in whole

or in part, was "wholly lacking." Therefore, as a factual matter, the Rutkins failed to demonstrate that the services rendered by Gianetti were "covered" under their health insurance plan, and there is no basis in the evidence, then, for determining whether the statute applies at all. In a typical balance billing case, the dispute arises after the insurance company has paid less than the full amount billed by the provider. See, e.g., *Gianetti* v. *Siglinger*, Superior Court, judicial district of Fairfield, Docket No. CV-98-0349830 (April 26, 2004) (36 Conn. L. Rptr. 869) (balance billing statute implicated where insurer paid $1980.80 and Gianetti claimed reasonable and customary fee for services was $6385), aff'd, 279 Conn. 130, 900 A.2d 520 (2006). Without a showing that some part of the medical services provided here were covered by the Rutkins' insurance, they could not appropriately seek the protection of § 20-7f (b).[12]

### III

The Rutkins additionally claim that the court erred by rejecting their defense of estoppel. We begin by noting that the court's ruling on this defense was premised on factual determinations. "[F]actual determinations will not be overturned on appeal unless they are clearly erroneous. . . . As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . Our review of factual determinations is limited to whether those findings are clearly erroneous. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and

[12] Because of our determination that § 20-7f (b) does not prohibit an out-of-network health care provider from billing patients directly, the Rutkins' claim that the court erred in rejecting its CUTPA must also fail. See *Ancona* v. *Manafort Bros., Inc.*, 56 Conn. App. 701, 715, 746 A.2d 184 (noting absence of "any authority that would support [the] claim that the filing of a civil action with probable cause could form the basis of a violation of CUTPA"), cert. denied, 252 Conn. 953, 749 A.2d 1202 (2000).

attitude. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Riscica* v. *Riscica*, 101 Conn. App. 199, 204–205, 921 A.2d 633 (2007).

"There are two essential elements to an estoppel—the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done. . . . [Further] [i]t is the burden of the person claiming the estoppel to show that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge." (Citations omitted; internal quotation marks omitted.) *Reinke* v. *Greenwich Hospital Assn.*, 175 Conn. 24, 28–29, 392 A.2d 966 (1978).

The Rutkins' estoppel claim is that employees in Gianetti's office told Rutkin that they would submit a claim for payment to their insurer, and, in reliance on these representations, the Rutkins did not themselves take any action with respect to the subject bill.[13] The court found there was no representation from Gianetti's office that it would submit the claim. The court observed that such a promise would have been inconsistent with the multiple bills sent to Rutkin, marked with escalating levels of urgency. The court found that the Rutkins had an obligation, and the means, to ascertain the truth regarding the status of the bill after receiving multiple

---

[13] There was testimony at trial that the insurer required a claim to be submitted within one year of the service.

notices clearly indicating that their insurer had not processed the claim. The court's finding in this regard, therefore, is not clearly erroneous.[14]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[14] The court also found unavailing a related estoppel claim based on the premise that billing the Rutkins was improper simply because Gianetti could have submitted a claim to their insurer but chose not to do so. The court stated that Gianetti testified that he did not believe, as an out-of-network provider, that he could submit a claim on a patient's behalf to their insurer, and the Rutkins presented no evidence to refute this position. Even if Gianetti was mistaken, the Rutkins certainly possessed "convenient means of acquiring . . . knowledge"; (internal quotation marks omitted) *Reinke* v. *Greenwich Hospital Assn.*, supra, 175 Conn. 29; as to whether it was possible for Gianetti to submit a claim.