******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LAWRENCE H. ADLER *v.* EDWARD M. ROSENTHAL
(AC 36593)

Keller, Mullins and Schaller, Js.

*Argued October 19, 2015—officially released March 15, 2016*

(Appeal from Superior Court, judicial district of Harford, Hon. Jerry Wagner, judge trial referee [motion to dismiss]; Vacchelli, J. [request to amend complaint; judgment].)

*Hugh D. Hughes*, for the appellant-appellee (defendant).

*William B. Wynne*, with whom, on the brief was *Heidi Zultowsky*, for the appellee-appellant (plaintiff).

*Opinion*

KELLER, J. In this breach of contract action stemming from an agreement to form a law partnership, the defendant, Attorney Edward M. Rosenthal, appeals from the judgment of the trial court, following a hearing in damages, rendered in favor of the plaintiff, Attorney Lawrence H. Adler, and awarding him damages in the amount of $42,447.72, plus costs.[1] On appeal, the defendant claims that the court (1) improperly denied his motion to dismiss the plaintiff's action, and (2) improperly awarded the plaintiff damages for lost profits. The plaintiff filed a cross appeal, in which he claims that the court erred by (1) not allowing him to amend his complaint to include a claim for paralegal time expended addressing the defendant's failure to join their contemplated law partnership, (2) failing to award him damages for time that he expended addressing the defendant's failure to join their contemplated law partnership, and (3) failing to award him damages for the cost he incurred by hiring an associate to replace the defendant. With respect to the defendant's appeal, we reverse the court's judgment in part, with respect to its award of lost profits, and remand the case to that court with direction to vacate that portion of its damages award. We affirm the judgment of the trial court in all other respects, including with respect to the plaintiff's cross appeal.

The following facts, as found by the trial court, and procedural history inform our review of the present appeal. In 2008, the plaintiff left his partnership position at a law firm and began to explore the possibility of starting his own law firm. In the plaintiff's efforts to start a new firm, he met with the defendant for the first time on July 14, 2008. During this meeting, the plaintiff proposed to the defendant that they enter into a partnership to start their own law firm. The defendant indicated that he was interested, but he did not formally agree to enter into a partnership at that time. In the following weeks, the plaintiff and the defendant communicated with each other and met several times to discuss the new law firm. Additionally, the plaintiff and the defendant looked for potential office space and discussed other matters with each other related to their own practices, including expected income, draws, and expenses.

On July 29, 2008, the plaintiff and the defendant met in Bushnell Park in Hartford and signed a one page "Prelim[in]ary Partnership Agreement" (preliminary agreement) to enter into a partnership in the business of practicing law. Pursuant to this preliminary agreement, the plaintiff and the defendant agreed to join their practices and to form a law firm called Adler Rosenthal, LLC, or some similar name. The plaintiff would hold an 80 percent interest in the firm, and the defendant would hold a 20 percent interest. Each partner would bring the files of all of his clients to the firm,

and each partner would retain the files of his respective original clients. The plaintiff's work included mostly contingency cases with some hourly work, and the defendant's work included mostly contingency cases, as well as representing nursing homes, which he billed hourly. In addition to these clients, the defendant would contribute office furniture and equipment that he already owned, which the new firm would use. The defendant would assist the plaintiff with his contingency work.

The preliminary agreement provided that the initial draws would be paid weekly, with the plaintiff to receive $250,000 annually and the defendant to receive $110,000 annually. The profits after costs, expenses, loan repayments, and initial draws would be divided in the first year based upon the plaintiff's 80 percent ownership interest and the defendant's 20 percent ownership interest. After the first year, profit sharing would be determined annually on the basis of the ratio of the originated receipts that each partner brought into the firm during the prior year, subject to some adjustments. The preliminary agreement provided that each partner would use good faith and fair dealing with the other partner and the firm, and it further provided that each partner would use his best efforts to bring in new clients and to work adequate hours.

The preliminary agreement did not provide a start or end date, and it did not contain a termination provision. Notwithstanding the absence of these provisions, the preliminary agreement did provide as follows: "In the event [the defendant] separates from the firm for any reason, each partner will retain their own clients (assuming the clients agree) and neither partner will solicit the other's clients. [The defendant] will be permitted to take the property, furniture, computers, etc he came to the firm with. Hourly clients will be billed by and for the firm until the partner taking the file departs. Contingency fee cases will have a lien placed on the recovery with the firm to receive the portion of the fee received based on the ratio of hours the file is worked on while the matter is at the firm as compared with the hours worked on the file after departure. The lat[t]er portion to go to the departing partner. Each paralegal hour will be equal to $1/2$ of each attorney hour for this computation." The preliminary agreement also contained a provision stating that each partner promised to enter into a more detailed written partnership agreement "shortly" after their partnership commenced.

On the same day that the plaintiff and the defendant signed the preliminary agreement, they both went to the Office of the Secretary of the State and filed organizational documentation for the firm, named Adler and Rosenthal, LLC. The defendant and the plaintiff also agreed that they would begin the partnership on Sep-

tember 1, 2008. In preparation for the start date, the plaintiff and his wife, who also worked as the plaintiff's business manager, began to take steps to establish the new law firm. Specifically, the plaintiff and his wife, under the business name of Adler and Rosenthal, LLC, met with landlords to discuss potential office space, negotiated with payroll, telephone, and insurance companies, interviewed and negotiated with prospective staff members, put an advertisement in the yellow pages, set up e-mail accounts and a computer system, opened bank accounts, purchased office supplies, and arranged for a construction crew to construct an office space in East Hartford.

Two days before the contemplated start date of the new firm, on August 30, 2008, the plaintiff arranged for movers to go to the defendant's office in Avon to pick up his office equipment and furniture and move it to the new firm's office in East Hartford. On this date, the plaintiff called the defendant at his office several times to see if he needed assistance with moving his equipment and furniture. The defendant at first did not answer or respond to the plaintiff's calls. When he finally did answer the phone, he told the plaintiff that he had decided not to go through with the formation of the law partnership of Adler and Rosenthal, LLC. In response, the plaintiff told the defendant that he had breached their preliminary agreement and that he planned to sue the defendant as a result.

On December 24, 2008, the plaintiff filed an application for a prejudgment remedy, which the trial court, *Aurigemma*, *J.*, denied on March 10, 2009. The plaintiff's complaint was dated April 17, 2009. On April 23, 2009, the plaintiff served the defendant with a writ of summons and complaint, which were returned to the court on April 30, 2009. In the four count complaint, the plaintiff pleaded causes of action sounding in breach of contract, detrimental reliance, negligent misrepresentation, and intentional misrepresentation.

The defendant filed a motion to dismiss the plaintiff's action on May 18, 2009. In his motion, the defendant claimed that the plaintiff's action should be dismissed because he failed to comply with General Statutes § 52-278j[2] by not serving process and returning it to the court within thirty days of the court's denial of the plaintiff's prejudgment remedy application. The defendant also argued that the plaintiff had failed to comply with General Statutes § 52-45a[3] in not designating a return date on the writ of summons and complaint. Subsequent to the defendant's filing his motion to dismiss, the plaintiff twice filed a request for leave to amend his writ of summons and complaint to include a proper return date.[4] The first request was filed on May 19, 2009, to which the defendant filed an objection on June 9, 2009. The second request was filed on June 12, 2009, and the defendant filed an objection on June 19, 2009. On

September 9, 2009, the trial court, *Hon. Jerry Wagner*, judge trial referee, denied the defendant's motion to dismiss, noting that § 52-278j did not mandate dismissal of the action due to the fact that there was no prejudice to the defendant by the amendment of the return date.[5]

Between 2010 and 2012, the plaintiff filed several motions for default against the defendant for his failure to plead. Ultimately, on December 19, 2012, the court entered a default judgment against the defendant for his failure to file an answer to the plaintiff's complaint, as ordered by the court at a dormancy calendar hearing. The plaintiff then claimed the matter for a hearing in damages, which the court, *Vacchelli, J.*, held over the course of two days, July 10, 2013, and October 22, 2013. The court heard testimony from the plaintiff and the defendant and admitted exhibits into evidence during this hearing.

On February 7, 2014, the court issued a memorandum of decision wherein it rendered judgment for the plaintiff upon the default of the defendant on all counts of the complaint and awarded the plaintiff damages in the amount of $42,447.72, plus costs. The court awarded the plaintiff $38,786.93 as damages for lost profits and $3678.79 as reliance damages for costs that the plaintiff incurred prior to the breach. The latter amount reflected costs incurred by the plaintiff in preparation for the start of the partnership, which included costs for recording with the secretary of the state's office, printing stationery, reconfiguring computers, and changing domain names. This appeal followed. On March 6, 2014, the plaintiff filed a cross appeal. Additional facts will be set forth as necessary.

## I

### DEFENDANT'S APPEAL

#### A

#### Motion to Dismiss

We first address the defendant's claim that the court improperly denied his motion to dismiss the plaintiff's action. The following additional facts are relevant to our resolution of this claim. In the defendant's May 18, 2009 motion to dismiss, he argued, as he does now on appeal, that the court should have dismissed the plaintiff's civil action because he failed to comply with § 52-278j (b) by not serving process and returning it to the court within thirty days of the court's denial of the plaintiff's prejudgment remedy application and, in the alternative, because he failed to comply with § 52-45a by not designating a return date on the writ of summons.

The record reflects that the court, *Aurigemma, J.*, denied the plaintiff's prejudgment remedy application on March 10, 2009. The plaintiff then served the defendant with a writ of summons and complaint in this civil action on April 23, 2009, more than thirty days beyond

the court's denial of the plaintiff's prejudgment remedy application. The defendant claims that the plaintiff's failure to serve the writ of summons and complaint and to file a return with the court within thirty days of the date on which his application for prejudgment remedy was denied by the court resulted in an effective withdrawal of his civil action pursuant to § 52-278j (b). After the defendant had filed his motion to dismiss, the plaintiff apparently realized the defects in process due to the failure to designate a return date and twice requested leave to amend the writ of summons and complaint. In the plaintiff's first request, dated May 19, 2009, he requested that the court permit him to amend the writ of summons and complaint to include a return date of June 30, 2009. In his second request, filed June 12, 2009, he requested that the court permit him to amend his process to include a return date of June 16, 2009, given that this date was inside of the sixty day window[6] from the date of the original summons, April 17, 2009.

The court, *Hon. Jerry Wagner*, judge trial referee, ultimately denied the defendant's motion to dismiss on September 9, 2009. In its order denying the motion, the court stated: "§ 52-278j does not mandate dismissal of this action. No prejudice to defendant by amended return date."

On appeal, the defendant claims that the court's denial of his motion to dismiss was error because the plaintiff's civil action was a "nullity," over which the court had no subject matter jurisdiction, because he violated § 52-278j (b) by failing to serve the defendant with the writ of summons and complaint and to return it to court within thirty days of the court's denial of the plaintiff's application for a prejudgment remedy. Further, the defendant argues that the court erred by denying the defendant's motion to dismiss because the plaintiff's civil action became a "nullity" once he failed to comply with § 52-45a by not designating a return date on the writ of summons and complaint that he served upon the defendant. The defendant also argues that the court erred because, even after the court granted the plaintiff's motion to amend to include a return date, the new return date fell outside of the sixty day window following the date of the process, which violated § 52-48 (b) and rendered the plaintiff's action "a nullity." In response, the plaintiff argues that the record is inadequate for this court to review the issues raised pertaining to this claim.[7] We conclude that the record is adequate for review, and we reject the defendant's arguments on this claim.

We begin our discussion by reviewing the distinctions between personal jurisdiction and subject matter jurisdiction. "[J]urisdiction of the subject-matter is the power [of the court] to hear and determine cases of the general class to which the proceedings in question

belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. . . . A defect in process, however, such as an improperly executed writ, implicates personal jurisdiction, rather than subject matter jurisdiction. . . . [W]hen a particular method of serving process is set forth by statute, that method must be followed. . . . Unless service of process is made as the statute prescribes, the court to which it is returnable does not acquire jurisdiction. . . . The jurisdiction that is found lacking, however, is jurisdiction over the person, not the subject matter." (Citations omitted; internal quotations marks omitted.) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 31, 848 A.2d 418 (2004).

1

First, we address the defendant's argument that the court's denial of his motion to dismiss constituted reversible error in light of the requirements of § 52-278j (b). The court denied the plaintiff's application for a prejudgment remedy on March 10, 2009. The plaintiff served the defendant with his signed writ of summons and complaint, dated April 17, 2009, on April 23, 2009, and it was returned to court on April 30, 2009. The defendant argues that the service of process had to be accomplished within thirty days of March 10, 2009, or the civil action effectively was withdrawn, and any action filed after the thirty day period must be dismissed for lack of subject matter jurisdiction. We disagree.

Our Supreme Court implicitly has treated a party's alleged noncompliance with § 52-278j as a jurisdictional issue that can be raised at any time during the pleadings, thereby resembling a challenge to subject matter jurisdiction. See *Baldwin Piano & Organ Co.* v. *Blake*, 186 Conn. 295, 297–98, 441 A.2d 183 (1982); see also *Sammarco* v. *Kostowski*, Superior Court, judicial district of Fairfield, Docket No. CV-09-5027402 (August 18, 2010). "In undertaking this review [of a motion to dismiss challenging subject matter jurisdiction], we are mindful of the well established notion that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *Dayner* v. *Archdiocese of Hartford*, 301 Conn. 759, 774, 23 A.3d 1192 (2011). "A determination regarding a trial court's subject matter jurisdiction is a question of law and, therefore, we employ the plenary standard of review and decide whether the court's conclusions are legally and logically correct and supported by the facts in the record." (Internal quotation marks omitted.) *State* v. *Williamson*, 155 Conn. App. 215, 219, 109 A.3d 924 (2015).

A party may seek prejudgment relief, such as an attachment on property, to secure the anticipated judgment. General Statutes § 52-278a et seq. That party sub-

mits a proposed unsigned copy of the writ of summons and complaint; General Statutes § 52-278c (a); but the civil action is not yet initiated. See *Bernhard-Thomas Building Systems*, *LLC* v. *Dunican*, 286 Conn. 548, 560–61, 944 A.2d 329 (2008). It is not until after the prejudgment remedy proceeding is completed that the applicant serves a signed writ, summons and complaint, and returns them to court to officially commence the action. See id., 555–56, 559. "[T]he language of the prejudgment remedy statutes, [General Statutes] § 52-278a et seq., in several instances . . . makes it clear that proceedings for prejudgment remedy applications and civil actions are separate and distinct, with a prejudgment remedy application generally preceding the filing of the civil action. . . . [I]n addition to the differences regarding the process for initiating these two legal proceedings, the purpose of filing a civil action is fundamentally different from the purpose of obtaining a prejudgment remedy. A prejudgment remedy application is brought as a prelude to the filing of a civil action, and is meant to determine whether security should be provided for any judgment ultimately recovered by the plaintiff if he or she is successful on the merits of the civil action. A civil action, in contrast, resolves the merits of the parties' claims, and can be filed irrespective of whether the plaintiff was successful in his or her prior pursuit of a prejudgment remedy." Id., 560–61.

Contrary to the defendant's interpretation, the plain language of § 52-278j provides for the dismissal or withdrawal of an application for a prejudgment remedy unless the plaintiff, within thirty days from the date the application is granted or denied, serves and returns to court the writ of summons and complaint in the civil action for which the prejudgment remedy was allowed or disallowed. General Statutes § 52-278j (a) and (b). Thus, the plaintiff was not required to serve the defendant with the writ of summons and complaint for his civil action and return it to court within thirty days of the date on which his application for a prejudgment remedy was denied, and his failure to do so did not mandate the dismissal of the *entire civil action* for lack of subject matter jurisdiction. Rather, the plaintiff's failure only required the court to consider his application for a prejudgment remedy to be withdrawn.

In *Sharp Electronics Corp.* v. *Solaire Development, LLC*, 156 Conn. App. 17, 27–28, 111 A.3d 533 (2015), this court held, inter alia, that for purposes of the thirty day limit prescribed in § 52-278j (a), the plaintiff's application for prejudgment remedy was granted on the date on which the court issued a final order specifying attachment as the remedy, rather than on the date on which the court issued an initial, conditional order lacking a specified remedy. Due to the fact that—as a result of the plaintiff's alleged noncompliance with § 52-278j (a)—the defendant in that case properly sought the dismissal of the plaintiff's prejudgment remedy, and not

its entire civil action, this court did not address the exact issue that confronts us in the present appeal. See id., 24. Nevertheless, for purposes of our analysis, it is notable that the court stated the following in *Sharp Electronics Corp.*: "Nothing in the language of § 52-278j implicates the jurisdiction of the court to continue to hear a civil matter in which a plaintiff has been granted a prejudgment remedy but has failed to comply with § 52-278j (a). . . . Although failure to comply with § 52-278j (a) does not implicate the court's jurisdiction, and therefore falls outside the scope of Practice Book § 10-30 and other rules governing motions to dismiss civil actions, a motion seeking to dismiss a prejudgment remedy is nevertheless an appropriate vehicle with which to alert the court of a plaintiff's failure to comply with § 52-278j (a). If a court determines that the plaintiff [has not complied with § 52-278j], the court lacks authority to do anything but to 'dismiss' (in the parlance of the statute) the prejudgment remedy." Id., 25.

In a similar vein, we observe that Connecticut trial courts have appropriately discerned the distinction to be drawn between a prejudgment remedy and a civil action with respect to the application of § 52-278j. See, e.g., *MacFarlane* v. *Luongo Construction & Development, LLC*, Superior Court, judicial district of New Haven, Docket No. CV-12-6028525-S (January 17, 2014) (court granted plaintiff's application for prejudgment remedy but plaintiff failed to serve defendant timely and, after court granted defendant's motion to dismiss action for failure to comply with § 52-278j (a), court responded to plaintiff's motion to reargue by "issu[ing] another order ruling that plaintiff correctly noted that [§] 52-278j requires . . . dismissal of . . . attachment and not . . . action"); *Constante* v. *Pecora*, Superior Court, judicial district of Fairfield, Docket No. CV-08-5017524-S (January 6, 2010) (49 Conn. L. Rptr. 134, 134, 136 and n.3) (parties entered into stipulated prejudgment remedy and court entered order requiring plaintiffs to serve defendants immediately and return proposed complaint but, when plaintiffs failed to take such action for six months, court granted motion to dismiss prejudgment remedy for noncompliance with § 52-278j (a) but denied motion to dismiss underlying action for lack of subject matter jurisdiction); *Outdoor Services Landscape Co.* v. *Custom Lawn & Limb, LLC*, Superior Court, judicial district of Fairfield, Docket No. PJR-CV-06-5003078-S (March 13, 2007) (43 Conn. L. Rptr. 19, 20, 22) (court denied defendant's motion to dismiss action for noncompliance with § 52-278j (b) holding that denial of prejudgment remedy application and plaintiff's subsequent failure to comply with § 52-278j (b) did not mandate dismissal of underlying civil action); *Burgess* v. *Burgess*, Superior Court, judicial district of Waterbury, Docket No. CV-04-4000033-S (March 28, 2005) (39 Conn. L. Rptr. 30, 31, 32) (plaintiff granted prejudgment remedy but filed process with

court beyond thirty day deadline and, when defendant objected to motion for disclosure of assets on ground that plaintiff failed to comply with § 52-278j (a) court held: "Since the thirty-day requirement in which the plaintiff had to serve and return to the court the writ, summons, and complaint . . . expired . . . before the plaintiff filed the mesne process with the court, the court lost subject matter jurisdiction over the prejudgment remedy. The prejudgment remedy is therefore dismissed without prejudice. *The writ, summons and complaint are not* [a]*ffected by this ruling.*" [Emphasis added.]).

On the basis of our review of the statute and the aforementioned case law, we conclude that the court did not err when it denied the defendant's motion to dismiss on this ground. When the plaintiff failed to serve the defendant and to return his civil action to court within thirty days after the denial of his application for a prejudgment remedy, the only action required of the court pursuant to § 52-278j (b) was to consider the application, *not the civil action*, withdrawn. The plaintiff's civil action was not subject to dismissal under the statute.

2

We next address the defendant's second alleged ground for dismissal: the plaintiff's failure to include a return date on the writ of summons and his failure, in amending the writ of summons and complaint, to include a return date that was within two months from the date on which the plaintiff had first served the defendant.

"[A] defendant's claims concerning service of the summons and complaint [or defective process itself] implicate personal, rather than subject matter, jurisdiction." (Internal quotation marks omitted.) *Morgan* v. *Hartford Hospital*, 301 Conn. 388, 401, 21 A.3d 451 (2011); see also *Pedro* v. *Miller*, 281 Conn. 112, 117, 914 A.2d 524 (2007). Thus, a motion to dismiss that attacks a defective return date, for example, implicates personal, rather than subject matter, jurisdiction, particularly because such a defect is curable. *Willamette Management Associates, Inc.* v. *Palczynski*, 134 Conn. App. 58, 65–66, 38 A.3d 1212 (2012). The interpretation of statutory requirements for service of process "is a question of law over which this court exercises plenary review. . . . [R]eview of the trial court's ultimate legal conclusion and resulting [decision to] [deny] [a] motion to dismiss will be de novo." (Citation omitted; internal quotation marks omitted.) *Morgan* v. *Hartford Hospital*, supra, 395. Unlike subject matter jurisdiction, personal jurisdiction may be created through consent or waiver. "[Practice Book § 10-32] specifically and unambiguously provides that any claim of lack of jurisdiction over the person as a result of an insufficiency of service of process is waived unless it is raised by a motion to

dismiss filed within thirty days in the sequence required by Practice Book § 10-6 . . . .” (Emphasis omitted.) *Pitchell* v. *Hartford*, 247 Conn. 422, 433, 722 A.2d 797 (1999). “Because a challenge to the personal jurisdiction of the trial court is a question of law, our review is plenary. . . . Although the court’s conclusions are subject to plenary review, [q]uestions of fact are subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” (Citation omitted; internal quotation marks omitted.) *Myrtle Mews Assn.*, *Inc*. v. *Bordes*, 125 Conn. App. 12, 15, 6 A.3d 163 (2010).

“The absence of a return date on the writ, whether the fault of a plaintiff or a court clerk, is unforgivable. . . . The return date is a necessary component of a writ by which a civil action is commenced. . . . Both the time within which process must be served after its issuance and the time within which the writ must be filed with the court after service are determined by reference to the return day.” (Citations omitted; footnote omitted; internal quotation marks omitted.) *Raynor* v. *Hickock Realty Corp.*, 61 Conn. App. 234, 242, 763 A.2d 54 (2000). Nevertheless, “[§] 52-72 creates an avenue to amend defects in the return date. . . . [O]ur Supreme Court has held that a remedial statute such as § 52-72 should be construed liberally as not to preclude jurisdiction merely because of a defective return date.” (Citation omitted.) *Olympia Mortgage Corp.* v. *Klein*, 61 Conn. App. 305, 309, 763 A.2d 1055 (2001). “[Section] 52-72 . . . provide[s] for amendment of otherwise incurable defects that go to the court’s jurisdiction. . . . The apparent intent of the legislature . . . [is] to prevent the loss of jurisdiction merely because of a defective return date.” (Internal quotation marks omitted.) Id., 308. “Despite the remedial nature of § 52-72 and the fact that the statute is to be liberally construed, our Supreme Court has established boundaries to the statute’s reach. . . . A return date may be amended but it still must comply with the time limitations set forth in § 52-48 (b).”[8] (Citation omitted; internal quotation marks omitted.) *Ribeiro* v. *Fasano, Ippolito & Lee, P.C.*, 157 Conn. App. 617, 621–22, 117 A.3d 965 (2015).

The second ground raised in the defendant’s motion to dismiss sought dismissal of the plaintiff’s civil action because of his failure to include a return date on the writ of summons and his failure, in amending the writ of summons and complaint, to include a return date that was within two months from the date on which the plaintiff first had served the defendant. The plaintiff immediately sought to cure the defective return date by filing his first request for leave to amend his writ of

summons and complaint on May 19, 2009, to designate a return date of June 30, 2009. On June 9, 2009, the defendant filed an untimely objection to the plaintiff's first request to amend. See Practice Book § 10-60 (a) (3). In his objection, the defendant claimed that the proposed amendment did not cure the defect in service because the return date designated in the amendment, June 30, 2009, was not within sixty days of April 17, 2009, the date on the original, defective writ of summons and complaint. See *Coppola* v. *Coppola*, 243 Conn. 657, 667 n.12, 707 A.2d 281 (1998); *Ribeiro* v. *Fasano, Ippolito & Lee, P.C.*, supra, 157 Conn. App. 623 n.3.

We decline to decide this issue on its merits because, procedurally, it was not properly raised in the trial court. The defendant did not object to the plaintiff's first request for leave to amend within fifteen days, as required by Practice Book §10-60 (a) (3).[9] Accordingly, the complaint as amended was deemed to have been filed with the consent of the adverse party by operation of the rule of practice sixteen days after the filing of the request, on June 4, 2009. See Practice Book § 10-60 (a) (3). The defendant did not file his objection until June 9, 2009, and the court never ruled on it, nor was it required to do so, because of the lateness of the filing of the objection.

Once the plaintiff's first amendment took effect, the only option available to the defendant was to file a second, amended motion to dismiss to address the newly amended writ of summons and complaint in order to assert his claim that the amended return date still presented a jurisdictional defect.[10] He did not do so. Subsequently, when the defendant later filed a request to revise the complaint on April 20, 2010, without having filed a subsequent motion to dismiss based on his claim that the amended return date still posed a jurisdictional defect, he waived any further right to pursue dismissal of the action based on insufficiency of service of process or lack of personal jurisdiction. See Practice Book § 10-32.[11] Accordingly, we decline to review this waived claim.

B

Lost Profits Award

We next address the defendant's claim that the trial court, *Vacchelli, J.*, upon the conclusion of the hearing in damages, improperly awarded lost profits to the plaintiff. The defendant's claim regarding the damages awarded for lost profits is in three parts. First, the defendant claims that there was no support in the evidence for the court's finding that the defendant would have contributed $250,000 to the firm's annual revenue. Second, the defendant claims that there was no basis in the evidence for the court's finding that the partnership between the parties would have lasted for at least six months. Third, the defendant claims that any award

of lost profits was improper because the preliminary agreement, which governed the rights of the parties if the defendant separated from the firm, did not provide for such an award under the present circumstances, in which the defendant did not join the firm.

Our resolution of the first claim is dispositive with respect to the issue of lost profits. Because we conclude that the plaintiff failed in his burden of proving what, if any, revenue the defendant would have contributed to the new firm, we conclude that *any* award of lost profits was improper. Accordingly, we shall not address the second and third claims raised with respect to the award of lost profits because we need not determine whether the court erroneously concluded, in light of the preliminary agreement between the parties, that it could award lost profits or whether the court erred by basing its award on a six month partnership between the parties.

The defendant argues that the court's finding of lost profits was clearly erroneous because profits for the firm were not reasonably certain, and, thus, the award was based on speculation. In opposition, the plaintiff argues that the court's finding was proper because the lost profits were reasonable and foreseeable damages that consequently arose from the defendant's breach. Furthermore, the plaintiff argues that the court properly awarded lost profits as reliance damages.[12] We disagree with the plaintiff and conclude that the trial court's finding that he was entitled to lost profits in the amount of $38,768.93 is clearly erroneous.

The following additional procedural history and facts are relevant to our resolution of this claim. At the hearing in damages, the plaintiff affirmatively responded to a question as to whether he "lost income as a result of the failure of [Adler and Rosenthal, LLC] and the breach of contract." The plaintiff further testified that the defendant represented that he would bring $250,000 in business to the new law firm, which would have increased profits accordingly because, under the plaintiff's rationale, all of the defendant's expenses would have been eliminated if he had joined Adler and Rosenthal, LLC. The plaintiff then testified about his calculations regarding lost profits arising from the defendant's breach by analyzing two time periods: one for the time period between September 1, 2008, and December 31, 2008, and the other for the 2009 calendar year.

For the time period spanning from September 1, 2008, to December 31, 2008, the plaintiff testified that based upon the defendant's commitment to bring in $250,000 to the firm annually, he would have added an additional $83,333.33 in firm compensation, thereby increasing the firm's net profits before partner pay from $118,241.60 to $201,574.93. On the basis of the initial draws set forth in the preliminary agreement,[13] the plaintiff then testified that of this $201,574.93 in net profits, $83,333.33

would have gone to the plaintiff and $36,666.66 would have gone to the defendant, which would have left $81,574.94 in profits remaining for the four month time period. The plaintiff then testified that, in accordance with the 80-20 percentage split in ownership as set forth in the preliminary agreement, the plaintiff and the defendant would have then divided this profits figure such that the plaintiff would have received his 80 percent share, $65,259.95. The plaintiff compared this figure to the amount of net profits that he actually did receive during this four month time period, which roughly amounted to $34,908.27. Specifically, the plaintiff submitted that the firm that he actually did form in the defendant's absence, Adler Law Group, LLC, received $118,241.60 in profits during this four month time period. After subtracting $83,333.33 of compensation from this figure, the plaintiff asserted that his actual profits figure for this time period was $34,908.27.[14] The plaintiff then subtracted this figure from the $65,259.95 that he purportedly would have received had the defendant joined the firm, leaving him with lost profits of $30,352.01.

For the next time period of January to December of 2009, the plaintiff testified that, in accordance with the defendant's commitment to bring $250,000 annually in business to the firm, the firm's profits would have increased from $557,488.88 to $807,488.48. The plaintiff then testified that, pursuant to the initial draw provision in the preliminary agreement, he would have distributed $250,000 to himself, $110,000 to the defendant, and the firm would have been left with net profits of $447,488.48 for the year of 2009. The plaintiff then multiplied this net profits figure by 80 percent in accordance with the preliminary agreement's provision on the ownership interests, which indicated that he would have received $357,990.78 in profits for 2009. The plaintiff then subtracted this figure from the amount of profit that he actually did receive for 2009 in the defendant's absence, $307,488.48, to arrive at his claimed lost profits figure of $50,501.52.

In the memorandum of decision wherein the court awarded the plaintiff lost profits as damages, it stated the following: "With respect to lost profits, the court accepts the plaintiff's financial data and calculations, based on the evidence of record of his actual income and expenses, in comparison to the expected additional income had the defendant joined the practice, minus the defendant's expected salary and share. Based on that evidence, the court finds that the absence of the defendant from the enterprise during the first calendar year (four months) resulted in a loss of reasonably expected additional net income to the plaintiff of $30,352.01. Accepting the plaintiff's data and calculations over the next full calendar year, the court finds the plaintiff's loss of reasonably expected additional net income for that year was $50,501.52. The pro rata

amount for two months is $8416.92. Adding these two subtotals, the court finds that the plaintiff's loss of reasonably expected additional net income over the allowed six month period was $38,768.93. Accordingly, the court awards the plaintiff $38,768.93 as damages for lost profits."

We begin our analysis by setting forth the appropriate standard of review and applicable principles of law. "The trial court has broad discretion in determining damages, and its decision will not be overturned unless it is clearly erroneous. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *O & G Industries, Inc.* v. *All Phase Enterprises, Inc.*, 112 Conn. App. 511, 528–29, 963 A.2d 676 (2009). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Gianetti* v. *Rutkin*, 142 Conn. App. 641, 656, 70 A.3d 104 (2013).

"It . . . is well established that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty." (Internal quotation marks omitted.) *FCM Group, Inc.* v. *Miller*, 300 Conn. 774, 804, 17 A.3d 40 (2011); see *Carrano* v. *Yale-New Haven Hospital*, 279 Conn. 622, 646, 904 A.2d 149 (2006); *Frillici* v. *Westport*, 264 Conn. 266, 283, 823 A.2d 1172 (2003). "We . . . note that there are circumstances in which proof of damages may be difficult and that such difficulty is, in itself, an insufficient reason for refusing an award once the right to damages has been established. . . . Nevertheless, the court must have evidence by which it can calculate the damages, which is not merely subjective or speculative . . . but which allows for some objective ascertainment of the amount. . . . This certainly does not mean that mathematical exactitude is a precondition to an award of damages, but we do require that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation [that] will enable the trier to make a fair and reasonable estimate. . . . Evidence is considered speculative when there is no documentation or detail in support of it and when the party relies on subjective opinion." (Citations omitted; internal quotation marks omitted.) *American Diamond*

*Exchange, Inc.* v. *Alpert*, 302 Conn. 494, 510–11, 28 A.3d 976 (2011). "A damages theory may be based on assumptions as long as those assumptions are reasonable in light of the record evidence. . . . The reasonableness of those assumptions is to be determined by the trier of fact." (Citation omitted; internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, 137 Conn. App. 359, 372, 48 A.3d 705, cert. denied, 307 Conn. 916, 54 A.3d 180 (2012).

"[L]ost profits may provide an appropriate measure of damages for the destruction of an unestablished enterprise, and . . . a flexible approach is best suited to ensuring that new businesses are compensated fully if they suffer damages as a result of a breach of contract, professional malpractice, or similar injuries." *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 67–68, 717 A.2d 724 (1998).

In reaching its decision to award the plaintiff lost profits as damages, the trial court credited the plaintiff's testimony regarding his calculations of the losses that Adler Law Group, LLC, incurred as a result of the defendant's failure to join the firm. A crucial piece of evidence upon which the court relied consisted of the defendant's alleged representation to the plaintiff during the formation of the preliminary agreement that he regularly brought in $250,000 a year to his own law firm, which the court attributed only to earnings derived from the defendant's representation of nursing homes. We conclude that the award of lost profits based on this evidence was clearly erroneous, as the evidence does not support the conclusion that the defendant earned, as profit, $250,000 a year from representing nursing homes. This finding apparently was adduced through the plaintiff's own testimony as to what the defendant had told him when they were discussing their contemplated law partnership. Specifically, the plaintiff testified that the defendant had told him that he would bring $250,000 in revenue to the firm each year. Initially, the plaintiff testified that the defendant had told him that this amount of revenue represented billable work. Later, the plaintiff testified that this amount represented the annual general revenue that the defendant purportedly would have brought to Adler and Rosenthal, LLC, had he joined it. On cross-examination, the plaintiff later admitted that he could not recall what percentage of the defendant's work was based upon contingency fee arrangements. The plaintiff further admitted that he knew that some of the defendant's work was work that was contingency fee based, yet he did not know what the defendant's actual originated receipts were for the years of 2008 and 2009. The defendant later testified that only one half of his caseload had been based upon his nursing home files and the other half had been based upon personal injury files, and that he had made more than $250,000 a year in some years and less than

$250,000 a year in other years.

The plaintiff testified concerning the defendant's practice, and the defendant also testified concerning the same, yet this evidence was insufficient to prove that the $250,000 figure accurately reflected what would have been the defendant's contribution, in profit, to the contemplated new firm. The plaintiff did not subpoena the defendant's profit and loss statements or tax documentation. There was no evidence as to what the defendant actually made or received as revenue or earned as profit, after subtracting losses or expenses, during 2008 and 2009. Thus, as the plaintiff himself testified, his lost profits calculations relied solely upon the indeterminate $250,000 figure that the defendant had given him.[15]

In *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 63, 68, 77, our Supreme Court held that lost profits for a reasonable time period could be an appropriate measure of damages for misconduct that causes the failure of an unestablished business enterprise, but it also held that the plaintiff in that case had failed to meet its burden of proving lost profits to a reasonable certainty. The plaintiff in *Beverly Hills Concepts, Inc.*, was a failed corporation that had been in the business of selling fitness equipment and that had sued a law firm for legal malpractice after the firm's errors had caused the Connecticut banking commissioner to issue several cease and desist orders to the corporation due to its failure to register properly as a "business opportunity" pursuant to the Connecticut Business Opportunity Investment Act, General Statutes (Rev. to 1987) § 36-503 et seq. *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 50–54. In assessing the plaintiff's claim for lost profits, our Supreme Court relied upon the discussion, in the Restatement (Second) of Torts, pertaining to the destruction of a new business, in which it was noted that courts, in resolving claims for lost profits, should analyze numerous factors related to the likelihood of the business' success if it had survived. Id., 65. These factors included general business conditions and the degree of success of similar enterprises. Id. Our Supreme Court further noted that it and courts in other jurisdictions had examined numerous other factors in determining whether projected lost profits were reasonably certain in a particular case, including evidence of the following: the plaintiff's prior experiences in the same business, the "plaintiff's experience in the same enterprise subsequent to the interference,"[16] comparisons between the plaintiff's experience and that of third parties in the same industry, and the average experience of participants in the same line of business. Id., 72–74. Most notably, our Supreme Court asserted that these factors must be "reasonably provable" and that "[b]ecause of a justifiable doubt as to the success of new and untried enterprises, more specific

evidence of their probable profits is required than when the claim is for harm to an established business." (Internal quotation marks omitted.) Id., 65.

Our Supreme Court noted that in other cases involving claims for lost profits successful plaintiffs had elicited expert testimony or had presented reliable statistical data about the projected profitability of the failed business enterprise. See id., 74–75; see, e.g., *Super Valu Stores, Inc.* v. *Peterson*, 506 So. 2d 317, 331–32 (Ala. 1987) (upholding lost profits award in breach of contract action where plaintiff presented statistical evaluation of future profit in support of lost profits claim and where defendant had compiled evaluation itself and deemed it reliable); *Chung* v. *Kaonohi Center Co.*, 62 Haw. 594, 606–607, 611, 618 P.2d 283 (1980) (upholding lost profits award in breach of contract action where plaintiff presented expert testimony of real estate and business appraiser that projected failed fast-food restaurant's revenues on basis of similar existing business), overruled on other grounds by *Francis* v. *Lee Enterprises, Inc.*, 89 Haw. 234, 239, 971 P.2d 707 (1999); *Fera* v. *Village Plaza, Inc.*, 396 Mich. 639, 645–48, 242 N.W.2d 372 (1976) (upholding lost profits award in breach of lease action where plaintiffs offered testimony of numerous experts in relevant industry about lost profits). Although the plaintiff in *Beverly Hills Concepts, Inc.*, also presented expert testimony about the projected lost profits of the failed fitness equipment business, our Supreme Court nevertheless deemed the expert's testimony insufficient to bring the evidence out of the realm of speculation, primarily because the plaintiff's expert had no experience in the fitness industry and had based his projections on informal interviews and articles in the lay press. See *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 75–76.

In the present case, the plaintiff did not present, to a degree of reasonable certainty, expert testimony or statistical evidence regarding lost profits that resulted from the defendant's failure to join the law firm. Instead, the plaintiff only produced *his own* law firm's profit and loss statement for the sixteen month time period following the defendant's failure to join the firm. The plaintiff supplemented this data with *his own* testimony that the defendant had given him a confident projection, orally, that he would bring $250,000 in business to the law firm.[17] Furthermore, the plaintiff testified that he knew of the defendant's successful track record as a plaintiff's attorney, which thereby justified his confidence in the defendant's ability to deliver on his projection had he actually joined the firm.

Despite the facts that the defendant had an established law practice and that he continued to practice law after failing to join the plaintiff's firm, the plaintiff failed to submit any of the defendant's financial state-

ments into evidence in support of his lost profits claim. Although the plaintiff has expertise in the practice of law, we conclude that his own testimony about his law firm's finances is insufficient to establish, to a degree of reasonable certainty, the amount of profits his firm lost as a result of the defendant's failure to bring his business to the firm. At the very least, the plaintiff should have attempted to submit evidence of the defendant's own profits and losses during the relevant time period. This necessity is especially heightened in this case because evidence was presented to the court that much of the defendant's work was contingency fee based, and the amount and timing of profits fluctuated regularly. We therefore conclude that the trial court's finding on lost profits is clearly erroneous.

The proper remedy in the present situation is to remand the case to the trial court with direction to vacate the award of lost profits. Although the court erred in awarding lost profits, the plaintiff is not entitled to further relief in the form of a new hearing related to lost profits. As our foregoing analysis demonstrates, the plaintiff failed in his burden of proving an entitlement to any amount of lost profits resulting from the defendant's failure to join the firm. "It is well established that in administrative, civil and criminal cases, when the party charged with the burden of proof fails to satisfy that burden, it is not entitled to a second 'bite at the apple' on remand." *Shelton* v. *Statewide Grievance Committee*, 277 Conn. 99, 111, 890 A.2d 104 (2006).

II

PLAINTIFF'S CROSS APPEAL

In his cross appeal, the plaintiff claims that the trial court erred by not allowing him to amend his complaint[18] to include a claim for damages related to paralegal fees incurred as a result of the defendant's failure to join the firm.[19] Next, the plaintiff claims that the court erred by not awarding him damages to compensate him for the time that he personally expended addressing the defendant's failure to join the firm. Finally, the plaintiff claims that the court erred by excluding $80,000 from his damages award, which he alleges was a cost that he incurred due to his need to hire a new associate to replace the defendant. We will address each of these claims in turn.

A

First, we address the plaintiff's claim that the court improperly denied his request to amend his complaint. We disagree.

The following additional facts are relevant to this claim. On July 10, 2013, the first day of the hearing in damages, the plaintiff attempted to present evidence that he had incurred damages resulting from the time that his paralegals and support staff had expended to "deal with the demise of Adler [and] Rosenthal and the

startup of Adler Law Group, LLC . . . ." The plaintiff testified that he "lost monies that [he] could have otherwise billed or utilized my staff for while they were rectifying the problems created by this incident." The defendant objected to the admission of such evidence on the ground that, although the plaintiff had alleged in his complaint that he was seeking lost billing time for himself, he had not alleged that he was seeking lost billing time for his staff, including paralegals. The court sustained the objection.

Following the court's ruling, the plaintiff orally requested leave to amend his complaint to include a claim for damages arising from lost billing time for the plaintiff's staff. The plaintiff asserted that an interrogatory answer afforded the defendant notice of the claim. The defendant objected to the request, arguing that it would cause the defendant "severe prejudice." The court, referring to the fact that the case had been pending since December, 2008, stated that it was "late in the day to be adding things that weren't clearly in the complaint." The court sustained the defendant's objection to the plaintiff's oral request to amend the complaint.

On July 16, 2013, the plaintiff filed a written request for leave to file an amended complaint encompassing a claim for lost billing time for staff, including paralegals. Therein, the plaintiff represented in relevant part that, at the hearing on July 10, 2013, the court had excluded evidence regarding the plaintiff's damages arising from lost billing time for his staff, including paralegals, because such matters were not pleaded in his complaint. The plaintiff set forth portions of his affidavit of debt of June 5, 2013, that pertained to these claims of damages, and suggested that the defendant had notice of these claims by virtue of the plaintiff's much earlier discovery responses. He represented that the requested amendments would neither delay the trial nor prejudice the defendant, and he sought to amend his complaint "to conform to the evidence presented at trial."

The defendant filed a timely written objection to the plaintiff's request. Primarily, the defendant argued that the court had already denied the request after the request was made orally by the defendant during the hearing on July 10, 2013, and that the present motion was merely an attempt by the plaintiff to relitigate the exact same issue. Also, the defendant argued that the request was "years late, made in the midst of trial, and would work a substantial prejudice to the defendant." The defendant argued that until the hearing on July 10, 2013, he lacked notice that the plaintiff sought damages of such nature and that he did not have an opportunity to properly defend against and conduct discovery with respect to such damage claims. The defendant represented that the plaintiff had not provided "any kind of

written verification" with respect to these claims of damages in discovery. (Emphasis omitted.) Additionally, he rebuffed the plaintiff's suggestion that he had afforded the defendant notice of the claim by means of an affidavit of debt filed on June 5, 2013, which the defendant characterized as "on the eve of trial." By means of electronic notice, the court sustained the defendant's objection to the request to amend.

"A trial court's ruling on a motion of a party to amend its complaint will be disturbed only on the showing of a clear abuse of discretion. . . . Whether to allow an amendment is a matter left to the sound discretion of the trial court. [An appellate] court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion. . . .

"A trial court may allow, in its discretion, an amendment to pleadings before, during, or after trial to conform to the proof. . . . Factors to be considered in passing on a motion to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. . . . The essential tests are whether the ruling of the court will work an injustice to either the plaintiff or the defendant and whether the granting of the motion will unduly delay a trial." (Citations omitted; internal quotation marks omitted.) *Franc* v. *Bethel Holding Co.*, 73 Conn. App. 114, 132, 807 A.2d 519, cert. granted on other grounds, 262 Conn. 923, 812 A.2d 864 (2002) (appeal withdrawn October 21, 2003); see also Practice Book § 10-60 (providing that party may amend pleadings or other parts of record or proceedings).

In the present case, it is not in dispute that the plaintiff sought to amend his complaint, not prior to or on the very eve of trial, but during the trial itself. The plaintiff did not demonstrate that he had put the defendant on notice of the substance of the claims at issue at a point in time at which the defendant could have adequately prepared to defend against them. The requests to amend the complaint at issue were made more than four years after the plaintiff had commenced this action. Although the plaintiff argued that he sought to amend his complaint to conform to the evidence presented at trial, the record reflects that, following the defendant's objection to evidence of lost billing time for the plaintiff's staff, the court disallowed such evidence. The court denied the defendant's oral request to amend at the hearing in damages on July 10, 2013; his written motion seeking leave to amend merely was an attempt to relitigate that ruling. In light of the evidence considered by the court, the lateness of the plaintiff's request made during the trial, and the likelihood that an amendment would have caused significant prejudice to the defendant, we conclude that the court's ruling did not reflect an abuse of its discretion.

B

Next, we address the plaintiff's claim that the court erred by not awarding damages to compensate him for the time that he spent in addressing the defendant's failure to join his firm. In opposition, the defendant argues that the court's finding in this regard is not clearly erroneous. We agree with the defendant.

We reiterate that "[t]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 68–69.

In the present case, the trial court rendered its findings concerning a damages award on the basis of numerous exhibits and two days of testimony. The plaintiff testified at length about the amount of time that he allegedly spent working to address the needs of his firm as a result of the defendant's failure to join it. The plaintiff, the court noted, testified that he personally spent approximately seventy-five hours informing clients and vendors about the firm change caused by the defendant's failure to join as promised and in correcting erroneous payments to the nonexistent Adler and Rosenthal, LLC. The court, however, declined to award the plaintiff compensation for his personal time in the total amount of $28,125 that he was claiming because he provided no time sheets or other evidence justifying an award to that extent. The court therefore ruled that there was no sufficient factual predicate for the award requested, and it refused to speculate as to the time that the plaintiff actually spent on those matters. See id., 69. The court was in the best position to assess the credibility of the evidence submitted at trial and to make findings of fact based upon this assessment. On the basis of our review of the record, we conclude that the court's findings regarding the time that the plaintiff spent in addressing the defendant's failure to join the firm were not clearly erroneous.

C

Lastly, we address the plaintiff's claim on cross appeal that the court erred by excluding from its damage award an additional $80,000 cost that the plaintiff claimed to have incurred as a result of his hiring an associate attorney at his firm to replace the defendant.

In its memorandum of decision, the court stated that the $80,000 amount "was a savings over the defendant's expected minimum $110,000 yearly draw." As a result, the court found in the memorandum of decision that "[t]he plaintiff experienced no financial loss" in that regard and it accordingly refused to award damages on that claim.

The clearly erroneous standard of review applies to this claim, given that it pertains to the court's determination of damages. Id., 68. The plaintiff presented testimony and exhibits regarding his hiring of an associate attorney at his firm after the partnership with the defendant did not occur. In its determination of damages, the court assessed this evidence, and it determined that the plaintiff's hiring of a new associate did not result in harm to the plaintiff because the new associate's salary was less than the salary that would have been paid to the defendant. Moreover, we observe that there was no persuasive evidence that the plaintiff's hiring of the new associate was done for the primary purpose of "replac[ing]" the defendant, given that the defendant never actually joined the firm and accordingly added nothing to the plaintiff's caseload, which required the attention of a new associate regardless of the defendant's actions. In this regard, the court observed that one of the reasons why the defendant did not join the firm was that, apart from his work with his own clients, he was concerned about the "many new files he would be assigned to by the plaintiff." Thus, we conclude that the court's decision not to award the plaintiff the cost of hiring a new associate was not clearly erroneous.

The judgment is reversed only with respect to the court's award of $38,786.93 for lost profits, and the case is remanded to the trial court with direction to vacate that award; the judgment is affirmed in all other respects, including as to the plaintiff's cross appeal.

In this opinion the other judges concurred.

[1] We note that in the trial court proceedings, the parties were self-represented and represented by counsel. On appeal, both parties were represented by counsel at oral argument.

[2] General Statutes § 52-278j provides in relevant part: "(a) If an application for a prejudgment remedy is granted but the plaintiff, within thirty days thereof, does not serve and return to court the writ, summons and complaint for which the prejudgment remedy was allowed, the court shall dismiss the prejudgment remedy.

"(b) If an application for a prejudgment remedy is denied and the plaintiff, within thirty days thereof, does not serve and return to court the writ of summons and complaint for which the prejudgment remedy was requested . . . the court shall order the application to be considered as having been withdrawn. . . ."

[3] General Statutes § 52-45a provides: "Civil actions shall be commenced by legal process consisting of a writ of summons or attachment, describing the parties, the court to which it is returnable, the return day, the date and place for the filing of an appearance and information required by the Office of the Chief Court Administrator. The writ shall be accompanied by the plaintiff's complaint. The writ may run into any judicial district and shall be signed by a commissioner of the Superior Court or a judge or clerk of the court to which it is returnable."

[4] Practice Book § 10-60 states in relevant part that "a party may amend his or her pleadings or other parts of the record or proceedings at any time

. . . [b]y filing a request for leave to file such amendment, with the amendment appended, after service upon each party as provided by Sections 10-12 through 10-17, and with proof of service endorsed thereon. If no objection thereto has been filed by any party within fifteen days from the date of the filing of said request, the amendment shall be deemed to have been filed by consent of the adverse party."

[5] Our review of the record reveals that the court never issued any order regarding the defendant's objections to either of the plaintiff's two requests to amend the return date on the writ of summons and complaint. In his brief, however, the defendant states that "[t]he trial court granted an amendment to the return date pursuant to . . . § 52-72" based on the plaintiff's first request to amend, but this did not cure the deficiency because the return date on the amendment permitted by the court was more than sixty days after service of the original writ of summons and complaint. See General Statutes § 52-48 (b) (providing that return date must be made no later than two months after date of process).

[6] In making his request, the plaintiff cited General Statutes § 52-48 (b), which provides: "All process shall be made returnable not later than two months after the date of the process and shall designate the place where court is to be held."

[7] Specifically, the plaintiff argues the following in his brief: "Most notably, all of the issues with reference to the motion to dismiss were extensively addressed by the lower court by way of briefs and oral argument. There is no written decision of the court's denial of the defendant's motion to dismiss. The defendant never requested a motion for articulation of the decision denying his motion to dismiss. There is no sufficient record for this court to review as this issue was not raised at trial. The defendant never filed a notice of intent to appeal Judge Wagner's decision . . . although . . . Practice Book § 62-5 provided the proper avenue for redress of the denial. Therefore, the record is not adequate to permit [this court] to review the issues raised. . . . Pursuant to . . . Practice Book §§ 66-5 and 66-6, the defendant could have taken action to perfect the record for review of the denial of his motion to dismiss, yet he chose otherwise." The plaintiff also noted in his argument to this court that the trial court made no mention of the defendant's motion to dismiss in its memorandum of decision following the hearing in damages. Despite these arguments, we disagree with the plaintiff that the record is inadequate to review this claim and, therefore, we reach its merits.

[8] See footnote 6 of this opinion.

[9] Practice Book § 10-60 (a) (3) provides in relevant part: "(a) Except as provided in Section 10-66, a party may amend his or her pleadings or other parts of the record or proceedings at any time subsequent to that stated in the preceding section in the following manner . . . (3) By filing a request for leave to file such amendment, with the amendment appended, after service upon each party as provided by Sections 10-12 through 10-17, and with proof of service endorsed thereon. If no objection thereto has been filed by any party within fifteen days from the date of the filing of said request, the amendment shall be deemed to have been filed by consent of the adverse party. . . ."

[10] Practice Book § 10-61 provides: "When any pleading is amended the adverse party may plead thereto within the time provided by Section 10-8 or, if the adverse party has already pleaded, alter the pleading, if desired, within ten days after such amendment or such other time as the rules of practice, or the judicial authority, may prescribe, and thereafter pleadings shall advance in the time provided by that section. If the adverse party fails to plead further, pleadings already filed by the adverse party shall be regarded as applicable so far as possible to the amended pleading."

[11] Practice Book § 10-32 provides: "Any claim of lack of jurisdiction over the person or improper venue or insufficiency of process or insufficiency of service of process is waived if not raised by a motion to dismiss filed in the sequence provided in Sections 10-6 and 10-7 and within the time provided by Section 10-30." Practice Book 10-6 prescribes the following order of pleadings: the plaintiff's complaint, the defendant's motion to dismiss the complaint, the defendant's request to revise the complaint, the defendant's motion to strike the complaint, the defendant's answer including any special defenses to the complaint, the plaintiff's request to revise the defendant's answer, the plaintiff's motion to strike the defendant's answer, the plaintiff's reply to any special defenses. Practice Book § 10-7 provides: "In all cases, when the judicial authority does not otherwise order, the filing of any pleading provided for by [Practice Book § 10-6] will waive the right to file

any pleading which might have been filed in due order and which precedes it in the order of pleading provided in that section."

[12] We agree with the defendant that lost profits resulting from a breach of contract must be proven with reasonable certainty. See *Gianetti* v. *Norwalk Hospital*, 304 Conn. 754, 758, 781, 43 A.3d 567 (2012). To the extent that the plaintiff argues otherwise, we disagree with the plaintiff.

Moreover, we disagree with the plaintiff's argument that lost profits properly were awarded as reliance damages. The case cited by the plaintiff to support this argument, *ATACS Corp.* v. *Trans World Communications*, *Inc.*, 155 F.3d 659, 669 (3d Cir. 1998), does not equate lost profits damages with reliance damages. Instead, the court in that case suggested that reliance damages may be awarded to protect an injured party's reliance interest when a court cannot measure lost profits, permitting the recovery of expenditures made in anticipation of performance under the contract. Id. The issue of reliance damages in the present case, which represented office start up expenditures incurred by the plaintiff in anticipation of performance, was *separate and distinct* from the issue of lost profits, the latter representing a measure of damages that the plaintiff would have realized if the contract had been performed in full. See *Chila* v. *Stuart*, 81 Conn. App. 458, 466, 840 A.2d 1176, cert. denied, 268 Conn. 917, 847 A.2d 311 (2004).

[13] Specifically, the preliminary agreement provided: "The initial draws will be paid [bi]weekly as money is available, with [the plaintiff] to receive $250,000 annually and [the defendant] to receive $110,000 annually."

[14] We observe that the dollar amounts used in the plaintiff's lost profits calculations, as submitted by him through his testimony, slightly conflict with the dollar amounts submitted in his affidavit of debt, as well as with the dollar amounts stated in the trial court's memorandum of decision. It appears as though the trial court, within its discretion, relied upon the dollar amounts submitted in the plaintiff's affidavit of debt.

[15] While cross-examining the defendant, the plaintiff tried to elicit testimony about the defendant's own profits and losses during 2008 and 2009, but he was unsuccessful in doing so because, in the absence of documentation to refresh his memory, the defendant could not recall what his profits and losses were for those years.

[16] For this factor, our Supreme Court cited cases from other jurisdictions, including: *El Fredo Pizza*, *Inc.* v. *Roto-Flex Oven Co.*, 199 Neb. 697, 708, 711, 261 N.W.2d 358 (1978) (evidence of increased profits after defendant's defective oven was replaced amounted to reasonably certain evidence of lost profits); *Gaudy* v. *Seaman*, 188 Pa. Super. 475, 478, 479–80, 149 A.2d 523 (1959) (evidence of plaintiff's success at different location after moving from previous location as result of defendant's breach of lease amounted to reasonably certain lost profits); and *Cook Associates*, *Inc.* v. *Warnick*, 664 P.2d 1161, 1165–66 (Utah 1983) (evidence comparing plaintiff's profits and losses between two of its plants in different states, where one suffered from defendant's breach and other did not, amounted to reasonably certain lost profits). Thus, we observe that these cases involve facts that differ materially from the facts of the present case, insofar as the defendants in those cases actually had been working with the plaintiffs such that they involved joint business track records, as opposed to this case, in which the parties never had worked together.

[17] We nevertheless observe that the defendant testified that there had been years in the past during which he had brought in more than $250,000 in revenue for his own practice, as well as other years during which he had brought in less than that amount.

[18] Pursuant to Practice Book § 10-60 (a) (3), the plaintiff filed a written request for leave to amend his complaint on July 16, 2013. On October 22, 2013, the court, in a written order, denied the plaintiff's request.

[19] Specifically, the plaintiff claims that, after the defendant failed to join the firm, paralegals and other members of the support staff working at the plaintiff's firm were forced to expend time doing the following: (1) filing new appearances in the numerous matters in which the firm previously had filed appearances for Adler and Rosenthal, LLC; (2) addressing clients' concerns regarding the defendant's failure to join the firm; and (3) changing logos, letterhead, envelopes, and other customized materials bearing the name of Adler and Rosenthal, LLC.