******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ENRICO VACCARO *v.* WILLIAM
D'ANGELO ET AL.
(AC 40258)

Keller, Bright and Beach, Js.

*Syllabus*

The plaintiff stakeholder, an attorney who previously represented the defen-
dant B in an action against a third party to recover for personal injuries,
brought an action for interpleader to determine the rights of B and the
defendant D, B's former chiropractic physician, to a portion of the funds
from a settlement resolving B's personal injury action. B failed to pay
D for certain chiropractic services provided by him during visits that
exceeded the annual limit of ten chiropractic visits under B's health
plan. The matter was tried to the trial court, which rendered judgment
ordering the distribution of the funds in part to D, including D's requested
amount for chiropractic services provided to B, and the distribution of
the remaining funds to B, from which the plaintiff appealed and B cross
appealed to this court. Thereafter, the plaintiff withdrew his appeal. On
the cross appeal, B claimed that the trial court improperly determined
that D was entitled to a portion of the settlement funds because D failed
to comply with a certain provision (§ 2.03.12) in his provider agreement,
and because an authorization form provided by D at B's initial visit, which
was the basis for D's claim to the settlement funds, was unenforceable.
Specifically, B claimed that D's authorization form was illegal on its
face and contrary to public policy because it violated the statute ([Rev. to
2011] § 20-7f [b]) that makes it an unfair billing practice for a healthcare
provider to request payment, other than a co-payment or deductible,
from an enrollee for medical services covered under a managed care
plan, and because it violated certain other statutory provisions ([Rev.
to 2011] § 36a-573 and § 42-150aa [b]). *Held*:

1. B could not prevail on his claim that, once he had exhausted his chiroprac-
tic benefit under his health plan, § 2.03.12 (b) in the provider agreement
required D to provide B with an acknowledgment form, listing all noncov-
ered services, at each and every subsequent visit prior to treating B,
and, thus, that D was precluded from seeking payment for noncovered
services because he failed to provide B with that form prior to rendering
treatment for which B would be billed directly; D did not breach the
provider agreement by failing to properly utilize the acknowledgment
form, as D notified B in writing that he had exhausted his chiropractic
benefit for office visits under his health plan by providing B with a
verification form advising him that his insurance provided coverage for
only ten chiropractic visits per calendar year, the verification form
properly notified B in writing as to his financial responsibilities, covered
services, and member eligibility and benefits, as required by § 2.03.12
(d) in the provider agreement, and it was readily apparent from the
applicable language in both the provider agreement and the acknowledg-
ment form that § 2.03.12 (b) applies to noncovered services, which are
services that are not covered under a member's health plan, and is not
applicable to services that are covered under a health plan but are
subject to plan limits, such as services rendered for members who have
exhausted their chiropractic benefit under their health plan.

2. This court declined to review B's claim that the authorization form violated
§§ 36a-573 and 42-150aa (b), B having failed to brief that claim ade-
quately: B provided only conclusory statements and did not provide
analysis of the law, cite to case law, or explain how those statutes were
applicable to the facts of the present case; moreover, B could not prevail
on his claim that the authorization form was illegal and against public
policy because it violated § 20-7f (b), which addresses balance billing
and prohibits such billing for medical services covered under a managed
care plan, as the challenged provision in the authorization form did not
establish that balance billing is the inherent purpose of the authorization
form and B did not identify a single charge that would constitute balance
billing, and this court rejected B's construction of the challenged provi-
sion, as there was another completely plausible interpretation that would

not violate the statute and was completely consistent with D's obligations under § 2.03.12 (d) in the provider agreement, namely, that D could bill B directly for any charges that were not paid by B's insurance.

Argued May 22—officially released September 4, 2018

*Procedural History*

Action for interpleader to determine the defendants' rights to certain funds held by the plaintiff as a result of a settlement in a personal injury action commenced by the defendant Stephen Boileau, brought to the Superior Court in the judicial district of Fairfield, where the court, *Bellis*, *J.*, granted the plaintiff's motion for an interlocutory judgment of interpleader and ordered the plaintiff to deposit the funds with the clerk of the court; thereafter, the matter was tried to the court, *Radcliffe*, *J.*; judgment ordering distribution of the funds in part to the named defendant and in part to the defendant Stephen Boileau, from which the plaintiff appealed and the defendant Stephen Boileau cross appealed to this court; subsequently, the plaintiff withdrew his appeal. *Affirmed.*

*Andrew M. McPherson*, for the cross appellant (defendant Stephen Boileau).

*Sabato P. Fiano*, for the appellee (named defendant).

*Opinion*

BRIGHT, J. In this interpleader action, the plaintiff-stakeholder, Attorney Enrico Vaccaro, sought an order determining the rights of the defendant-claimant, Stephen Boileau, and the other defendant-claimant, William DeAngelo,[1] Boileau's chiropractic physician, to a portion of the proceeds from a settlement resolving Boileau's personal injury action. Boileau cross appeals[2] from the judgment of the trial court, rendered after a court trial, ordering that $5780 of the contested funds be disbursed to DeAngelo. On appeal, Boileau claims that the court improperly determined that DeAngelo is entitled to any portion of the settlement funds because: (1) DeAngelo failed to comply with the notice requirement of the provider services agreement between DeAngelo and the administrator of Boileau's health plan, and, therefore he may not bill Boileau for services rendered; and (2) the form that Boileau signed acknowledging his financial responsibility for services rendered by DeAngelo is illegal and unenforceable. We affirm the judgment of the trial court.

The record reveals the following facts, as found by the trial court or otherwise undisputed, and procedural history. Vaccaro represented Boileau in a personal injury action for injuries sustained in a motor vehicle accident that occurred on August 29, 2011. "Prior to retaining . . . Vaccaro to represent him, [Boileau] sought medical care and treatment for his injuries from . . . DeAngelo . . . d/b/a Neuro-Spinal Center of Connecticut." At that time, "Boileau was an enrollee in Cigna HealthCare [(Cigna)], a managed care health plan. Coverage under the plan was secured through his employer. . . . Boileau never received a summary of his health insurance plan from his employer, and was not familiar with the specific coverages afforded under the applicable policy."

At all relevant times, DeAngelo was a participating provider with Cigna and American Specialty Health Networks, Inc. (American). Cigna contracted with American "to provide administrative services and a network of Contracted Chiropractors to meet the health care and customer service needs of Members . . . ." DeAngelo and American entered into a "Provider Services Agreement" (provider agreement), which defined and governed their relationship, and respective rights and obligations. Pursuant to § 2.03.12 of the provider agreement, DeAngelo agreed, inter alia, "to properly notify Members in writing prior to the provision of Chiropractic Services" of their financial responsibilities, "Member Eligibility/Benefits," and "Covered Services."

On August 31, 2011, at his initial visit and prior to receiving treatment, Boileau signed a form provided by DeAngelo's office titled "Patient Authorization for

Treatment & Financial Policy" (authorization form). The authorization form provides in relevant part: "I fully understand that I am directly responsible to the Neuro-Spinal Center for all professional services submitted and agree to fully satisfy the bill for professional services rendered. I agree to pay you your regular charges for all medical services rendered to me. If so, I agree to pay those charges which are not paid by my health insurance. . . . Unpaid balances will be subject to an 18 [percent] finance charge per year or 1.5 [percent] per month."

DeAngelo's office also had Boileau sign a document titled "Notice of Physician's Lien" (letter of protection) on September 7, 2011, which provides in relevant part: "I hereby authorize and direct you, my attorney/insurance carrier, to pay directly to said doctor such sums as may be due and owing him for medical service rendered me both by reason of this accident and by reason of any other bills that are due his office and to withhold such sums from any settlement, judgment or verdict as may be necessary to adequately protect said doctor. And I hereby further give a [l]ien on my case to said doctor against any and all proceeds of my settlement, judgment or verdict which may be paid to you, my attorney/insurance carrier, or myself, as the result of the injuries for which I have been treated [or] injuries in connection therewith. . . .

"I fully understand that I am directly and fully responsible to said doctor for all medical bills submitted by him for service rendered me and that this agreement is made solely for said doctor's additional protection and in consideration of his awaiting payment. And I further understand that such payment is not contingent on any settlement, judgment or verdict by which I may eventually recover said fee. All unpaid balance[s] will be subject to an 18 [percent] finance charge or 1.5 [percent] per month." The letter of protection was signed by Vaccaro on September 19, 2011.

Subsequently, at his thirteenth treatment with DeAngelo, Boileau received an "Insurance Verification Sheet" (verification form), which indicated that his health plan covered only ten chiropractic treatments in each calendar year. At the bottom of the verification form, which Boileau signed on September 23, 2011, is the following: "I _____, understand that I have a maximum of _____ visits per calendar year. I understand that it is my responsibility to keep record of how many visits have been used. I understand that I will be responsible for any visits over this amount. I have read and understand the above and also understand the insurance company verbal verification is not a guarantee of benefits. Regardless of insurance, I am financially responsible." Although the blank spaces on the verification form were not filled in, the body of the document reflected that Boileau's insurance covered

only ten visits per calendar year, and Boileau's signature appears below the quoted provision. Boileau, despite knowing after he signed the verification form that his insurance covered only ten chiropractic office visits, received sixteen additional treatments from DeAngelo between September 23 and November 14, 2011, for a total of twenty-nine visits in 2011. In 2012, Boileau received eleven treatments from DeAngelo. Therefore, Boileau received a total of twenty visits that were not covered by his benefit plan, nineteen in 2011, and one in 2012.[3]

In January, 2014, Vaccaro obtained a settlement in Boileau's personal injury action in the amount of $75,000. In a letter addressed to DeAngelo dated January 24, 2014, Vaccaro stated: "With respect to your claim for $6059 from [Boileau] for services rendered, Cigna, his health insurance carrier, has advised that for services rendered by you in 2011 you are only owed $240. With respect to services rendered in 2012, you failed to submit any of these expenses to Cigna for payment although he was clearly covered for [ten] visits. You are at most, therefore, entitled to payment by [Boileau] for an eleventh treatment rendered on May 2, 2012, totaling $245, and for a report fee of $450. Enclosed, therefore, please find my check in the amount of $935 in full and final payment of these expenses. I trust that this concludes this matter." DeAngelo did not accept Vaccaro's payment.

"The exchange of correspondence and communications resulted in much acrimony, and . . . DeAngelo filed a grievance against . . . Vaccaro as a result." Thereafter, in March, 2015, Vaccaro commenced the underlying interpleader action, pursuant to General Statutes § 52-484,[4] seeking an order determining DeAngelo's and Boileau's rights to the $6059 from Boileau's personal injury settlement, and claiming an allowance for attorney's fees and costs incurred in bringing the action. The trial court, *Bellis, J.*, rendered an interlocutory judgment of interpleader,[5] and Vaccaro deposited the contested funds with the clerk of the court.

Subsequently, DeAngelo and Boileau filed their respective statements of claim.[6] See Practice Book § 23-44. DeAngelo claimed entitlement to a "total amount greater than $6059 . . . for professional services rendered, interest, attorney's fees and collection costs pursuant to" the authorization form and the letter of protection. Boileau claimed that "DeAngelo's [claim] to the interpleader funds [is] invalid as a matter of law" because it is "based on a contract [that] is illegal, [and] courts cannot enforce it, nor will they enforce any right springing from such [a] contract." According to Boileau, the authorization form is "a consumer contract, as defined by General Statutes [§] 42-151, which is patently illegal and unenforceable because it provides for the recovery of interest on unpaid balances at the rate of

18 [percent] per annum, in violation of General Statutes [§ 37-4 and General Statutes (Rev. to 2011) § 36a-573]; provides for the recovery of attorney's fees in excess of the maximum amount allowed under General Statutes [(Rev. to 2011) §] 42-150aa; provides for the recovery of sums by a health care provider for medical services covered under a managed care plan in violation of General Statutes [§] 20-7f; and provides for the recovery of report fees in violation of General Statutes [§] 20-7h,[7] all in violation of the [G]eneral [S]tatutes and public policies of this [s]tate." (Footnote added; internal quotation marks omitted.)

The court, *Radcliffe, J.*, held a trial on October 19, 2016.[8] At trial, Boileau, DeAngelo, and Deborah Lanci, a medical insurance specialist employed by DeAngelo, testified. During direct examination, Boileau testified that he knew that he was entitled to only ten chiropractic visits per calendar year after he signed the insurance verification form on September 23, 2011. Despite acknowledging that fact, Boileau testified that he thought his insurance would cover his treatment, and that "nobody said, oh, you're not going to be covered. Nobody came up to me and said, here, you're done on your ten visits. I didn't hear that part."

Lanci testified that DeAngelo's office submitted claims to Boileau's insurance for ten visits in 2011 and ten visits in 2012, but Boileau's insurance did not pay for four of the visits, two in 2011 and two in 2012, due to DeAngelo's failure to submit treatment plans after Boileau's eighth visit in each year. Although Boileau's account statement, which was admitted into evidence at trial, reflected a balance of $6059, DeAngelo's statement of claim alleged that Boileau owed $5239 for treatment. Lanci further testified that DeAngelo's office credited Boileau's account for those four visits, thereby explaining the discrepancy between Boileau's account statement, which reflected a balance of $6059, and DeAngelo's statement of claim, which claimed only $5239 for chiropractic services.

On March 6, 2017, the court issued its memorandum of decision. The court found that DeAngelo was entitled to $5780, including $5239 for chiropractic services provided to Boileau, $450 for an "impair rating" report, and $95 for other reports.[9] The court further found that Boileau was entitled to $279, the remaining balance of the interpleader funds. This appeal followed.

On appeal, Boileau claims that the court improperly determined that DeAngelo is entitled to any portion of the settlement funds because (1) DeAngelo failed to comply with the provider agreement, and (2) the authorization form, which is the basis for DeAngelo's claim to the settlement funds, is unenforceable, as it is "illegal on its face and is contrary to public policy."

As a preliminary matter, we note that the court's

memorandum of decision is unclear as to the legal basis for its conclusion as to its award of the settlement funds, and Boileau did not seek articulation of the court's decision. See Practice Book § 61-10. Although it would have been preferable for the trial court to provide its legal analysis in its memorandum of decision, "[w]hen the facts underlying a claim on appeal are not in dispute and that claim is subject to de novo review, the precise legal analysis undertaken by the trial court is not essential to the reviewing court's consideration of the issue on appeal." (Internal quotation marks omitted.) *State* v. *Donald*, 325 Conn. 346, 354, 157 A.3d 1134 (2017). In the present case, the court set forth the relevant factual findings, which are not challenged by the parties, in its memorandum of decision, and both of Boileau's claims are subject to de novo review. Accordingly, the record is adequate for review. See id.

I

Boileau first claims that the court improperly determined that DeAngelo is entitled to a portion of the settlement funds because DeAngelo failed to comply with the notice provision in the provider agreement. Specifically, he argues that DeAngelo, pursuant to the provider agreement, had to provide Boileau with a "Member Billing Acknowledgment" form (acknowledgment form) listing all "Non-Covered Services" prior to treating Boileau. According to Boileau, once he had exhausted his chiropractic benefit under his health plan, DeAngelo had to provide him with an acknowledgment form *at each and every subsequent visit* before treating him. Thus, he argues that "DeAngelo is precluded from seeking [payment] for [N]on-[C]overed [S]ervices (those services provided after the [tenth] treatment per calendar year) from . . . Boileau."

Both parties agree that the provider agreement is an unambiguous contract subject to plenary review on appeal. "The standard of review for contract interpretation is well established. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]." (Internal quotation marks omitted.) *Meeker* v. *Mahon*, 167 Conn. App. 627, 632, 143 A.3d 1193 (2016).

"In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction. . . . We accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract." (Internal quotation marks omitted.) *Welch* v. *Stonybrook Gardens Cooperative, Inc.*, 158 Conn. App. 185, 197, 118

A.3d 675, cert. denied, 318 Conn. 905, 122 A.3d 634 (2015). "Furthermore, [i]n giving meaning to the language of a contract, we presume that the parties did not intend to create an absurd result." (Internal quotation marks omitted.) *South End Plaza Assn., Inc.* v. *Cote*, 52 Conn. App. 374, 378, 727 A.2d 231 (1999).

Boileau does not dispute that DeAngelo rendered the treatments; he also does not claim that the charges for those treatments are unreasonable, or that DeAngelo misrepresented Boileau's eligibility and benefits under his health plan. In fact, on appeal, Boileau does not claim that DeAngelo did not notify him that he had exhausted his chiropractic benefit under his health plan. Instead, Boileau asserts that he is a third-party beneficiary of the provider agreement between American and DeAngelo,[10] that DeAngelo breached the provider agreement by failing to provide Boileau with the contractually required acknowledgment form identifying the "Non-Covered Services" prior to rendering treatment, and, as a result, he is contractually obligated to hold Boileau harmless for all charges for those visits in excess of Boileau's annual limit under his health plan. Consequently, the dispositive question is whether DeAngelo breached the provider agreement by failing to utilize the acknowledgment form after Boileau had exhausted his chiropractic benefit under his health plan. We conclude that he did not.

Boileau claims that § 2.03.12 of the provider agreement obligated DeAngelo to utilize the acknowledgment form detailing the specific "Non-Covered Services" prior to rendering treatment to Boileau after Boileau had exhausted his coverage under his health plan. Section 2.03.12 provides in relevant part: "<u>Contracted Chiropractor Notification to Members of Their Financial Responsibilities, Member Eligibility/Benefits, and Covered Services</u>. Members need to be notified by their Contracted Chiropractor of their financial responsibility for amounts they may owe Contracted Chiropractor for Chiropractic Services and of their [Member] Eligibility/Benefits and Covered Services prior to the provision of services. Therefore, Contracted Chiropractor agrees to properly notify Members in writing prior to the provision of Chiropractic Services as follows:

"(a) Members Determined to be Ineligible. Prior to or on the initial visit before rendering services, Contracted Chiropractor agrees to provide notification to all patients that represent themselves as Members that they must reimburse the Contracted Chiropractor for all rendered services if the Member is later determined to be ineligible with [American] or a Payor. The Initial Health Status form includes a section meeting the notification requirement.

"(b) Non-Covered Services. Contracted Chiropractor agrees to have any Member who desires to receive and self-pay for Non-Covered [S]ervices complete and exe-

cute the Member Billing Acknowledgment form prior to rendering services to the Member. The Member Billing Acknowledgment form includes a section where the Contracted Chiropractor must identify Non-Covered [S]ervices to be rendered and the amounts for which the Member is agreeing to self-pay the Contracted Chiropractor. . . .

"(d) Accuracy of Member Eligibility/Benefits and Covered Services Information. Contracted Chiropractor agrees to provide current Member Eligibility/Benefits and Covered Services information to Members. [American] shall provide Contracted Chiropractor with Member Eligibility/Benefits and Covered Services information through its provider services department . . . . Contracted Chiropractor must verify Member Eligibility/Benefits and Covered Services initially and periodically during a Member's course of treatment.

"Contracted Chiropractor agrees to properly inform Members of their financial responsibilities, Member Eligibility/Benefits and Covered Services. Contracted Chiropractor agrees to use the appropriate written notification process as defined in this Section and the Operations Manual. Contracted Chiropractor agrees and understands that in the absence of the proper notification and appropriate written agreement, the Member shall be held harmless by Contracted Chiropractor, [American] and/or Payor and agrees to waive all charges and not seek payment from Member, [American] and/or Payor."

"Covered Services," "Non-Covered Services" and "Member Eligibility/Benefits" are all defined terms in the provider agreement. "Covered Services" is defined as "Medically Necessary Services for Covered Conditions arranged under a Member Benefit Plan and, pursuant to this Agreement, which Contracted Chiropractor is licensed and qualified to provide and for which Contracted Chiropractor accepts payment from [American] or Payor as payment in full, except for applicable Member Payments." "Non-Covered Services" is defined as "all services other than those defined as Covered Services. Non-Covered Services are not subject to the Payor Summaries and Fee Schedule Amounts listed in Attachments D and E to this Agreement." "Member Eligibility/Benefits" is defined as "information . . . pertaining to each Member's eligibility, including initial date of eligibility and last date of eligibility and benefits including, but not limited to Member Payments such as co-payments, deductibles and/or co-insurance, annual benefit limits, such as 20, 30, or 40 visits, and remaining annual benefits."

Boileau argues that because it is undisputed that DeAngelo did not utilize the acknowledgment form prior to rendering the treatments for which Boileau would be billed directly, as allegedly required by § 2.03.12 (b) of the provider agreement, DeAngelo

breached the provider agreement. DeAngelo, however, argues that he complied with § 2.03.12 (d) by providing Boileau with the verification form advising him that his insurance provided coverage for only ten chiropractic visits per calendar year. DeAngelo further argues that § 2.03.12 (b) does not apply once a member has exhausted the benefits under the member's health plan, and "the purpose of the [acknowledgment] form was to avoid confusion in the event that the medical provider rendered specific, individual types of [N]on-[C]overed [S]ervices while simultaneously providing [C]overed [S]ervices within the scope of the subject plan (i.e., within the [ten] covered visits)." We conclude, on the basis of the evidence admitted at trial,[11] that § 2.03.12 (b) applies only to "Non-Covered Services," not to services rendered for members who have exhausted their chiropractic benefit under their health plan.

It is readily apparent from the language in both the provider agreement and the acknowledgment form that there is a distinction between services that are not covered under a member's health plan and services that are covered under a health plan, but are subject to plan limits. In particular, the language makes clear the different obligations a contracted chiropractor has depending on whether the provider is supplying information to the member regarding "Non-Covered Services" or supplying information regarding "Member Eligibility/Benefits" and "Covered Services."

Section 2.03.12 (b) requires DeAngelo to have a member sign an acknowledgment form before rendering "Non-Covered Services." The definitions of "Covered Services" and "Non-Covered Services" are clear in that they apply to the type of services being provided. Medically necessary services for covered conditions are "Covered Services." By definition, services that are not medically necessary are "Non-Covered Services." Significantly, § 2.03.12 (b) imposes no obligation on the contracted chiropractor regarding "Member Eligibility/Benefits," which, by definition, includes information regarding the number of visits for which a member has coverage in a given year. Instead, § 2.03.12 (d) sets forth the contracted chiropractor's obligation regarding "Member Eligibility/Benefits" and "Covered Services," which simply requires that the contracted chiropractor provide such information using "the appropriate written notification process as defined in this Section and the Operations Manual." It does not require use of the acknowledgement form, which is required for "Non-Covered Services" in accordance with § 2.03.12 (b).[12] Consequently, the notification requirement in § 2.03.12 (b) would not apply because visits exceeding the member's maximum benefit under the health plan are not "Non-Covered Services" under the provider agreement.

This interpretation is consistent with the language in the acknowledgment form providing that "Non-Covered

[S]ervices include services such as supplements that are not covered by the member's health plan. Non-Covered [S]ervices may also include services determined by [American] to be maintenance-type services." Those examples of "Non-Covered Services" are not related to a member's eligibility or benefits, and there is no indication that the form would apply to the number of services, in addition to particular types of services that always are not covered under the member's health plan. In addition, the acknowledgment form provides: "I . . . do hereby acknowledge that *a certain portion of my care will not be covered* by my . . . health plan under the terms of my Benefit Plan . . . ." (Emphasis added.) If a member has exhausted coverage under the health plan, then there is no portion of the member's care that will be covered, and it would be illogical to have the member acknowledge that "a certain portion" of the member's care will not be covered.

Furthermore, the acknowledgment form provides that DeAngelo may not bill a member "*during the course of*" a treatment plan approved by American, except for copays, deductibles, or charges for "Non-Covered Services." (Emphasis added.) This further supports our construction of the provider agreement because if a member is not covered for any office visits under the health plan, the member would not be receiving services "during the course of" an approved treatment plan. Thus, the acknowledgment form is required when a member is receiving services that are covered under the health plan, but has elected to receive additional services that are not covered under the health plan.[13]

Finally, our conclusion is supported by additional language in the provider agreement. Section 1.07 of the provider agreement provides in relevant part: "Claims Payment Amount. The Claims Payment Amount is the actual amount paid directly and solely by [American] to Contracted Chiropractor and shall be calculated by first deducting from billed charges submitted on a claim any amounts including but not limited to Non-Covered Services, duplicate billed amounts for services, *amounts exceeding benefit maximums or limitations of Member Benefit Plans* . . . ." (Emphasis added.) Accordingly, "amounts exceeding benefit maximums or limitations" is a distinct category from, and not the same as, "Non-Covered Services," although both types of services are services for which American will not pay the contracted chiropractor. In other words, if a member has exhausted the member's benefit for chiropractic visits, then American will not pay any charges for visits exceeding the member's maximum benefit under the health plan. The provider agreement, however, does not identify such services as "Non-Covered Services" and, therefore, a contracted chiropractor is not obligated to use an acknowledgment form when rendering services that exceed the member's chiroprac-

tic benefit limit.

Here, after DeAngelo informed Boileau that he had exhausted his chiropractic benefit under his health plan, Boileau was notified in writing as to his financial responsibilities, "Member Eligibility/Benefits" and "Covered Services," as required by § 2.03.12 (d) of the provider agreement. Once DeAngelo notified Boileau that he had exhausted his chiropractic benefit for office visits, DeAngelo satisfied the applicable notification requirement in § 2.03.12 (d), and § 2.03.12 (b) simply does not apply. Any other construction of the provider agreement and the acknowledgment form would lead to the absurd result of having Boileau sign an acknowledgment form for every visit, acknowledging that he will be financially responsible for "*a certain portion of*" his care, when, in fact, he has already acknowledged that there is no portion of his care that will be covered by his health plan because he exhausted his health plan's chiropractic benefit. We conclude that the parties to the provider agreement did not intend such a result. See *South End Plaza Assn., Inc.* v. *Cote*, supra, 52 Conn. App. 378 ("[i]n giving meaning to the language of a contract, we presume that the parties did not intend to create an absurd result" [internal quotation marks omitted]).

Consequently, the court properly concluded that DeAngelo is not precluded from billing Boileau for those visits that exceeded Boileau's maximum benefit under his health plan because DeAngelo was not required to have Boileau sign an acknowledgment form prior to each and every one of those visits.

II

Boileau also claims that the court improperly awarded a portion of the settlement funds to DeAngelo because the authorization form, which is the basis for DeAngelo's claim to the $5780 of the settlement funds, is "illegal on its face and is contrary to public policy." Specifically, Boileau claims that the authorization form violates General Statutes (Rev. to 2011) § 20-7f (b),[14] General Statutes (Rev. to 2011) § 36a-573,[15] and § 42-150aa (b),[16] and, therefore, it is illegal and unenforceable. We disagree.

We begin by setting forth our standard of review. "A trial court's decision as to whether a contract is illegal and unenforceable involves a question of law which entails our application of plenary review. . . . Similarly . . . the question [of] whether a contract is against public policy is [a] question of law dependent on the circumstances of the particular case . . . ." (Citations omitted; internal quotation marks omitted.) *Carriage House I-Enfield Assn., Inc.* v. *Johnston*, 160 Conn. App. 226, 245–46, 124 A.3d 952 (2015).

The entirety of Boileau's argument is as follows: "In the present action . . . § 20-7f (b) provides that it is

an unfair billing practice for a healthcare provider to request payment from an enrollee, other than a copayment or deductible, for medical services covered under a 'managed care plan.' . . . DeAngelo is a healthcare provider as defined in the . . . General Statutes. The [authorization] form unequivocally establishes that it makes . . . Boileau responsible for 'all professional services submitted,' that . . . Boileau agrees 'to fully satisfy the bill for professional services rendered,' that . . . Boileau agrees to 'pay those charges [that] are not paid by my health insurance.' As a result, the [authorization form] on its face negates . . . § 20-7f (b), thereby making the [authorization form] illegal and unenforceable.

"Furthermore, as previously stated . . . Lanci, who is . . . DeAngelo's billing specialist, testified that . . . DeAngelo, as a practice, never uses the [acknowledgment form] because . . . DeAngelo never bills for [N]on-[C]overed [S]ervices, thereby further showing that the intent of the [authorization form] is to violate . . . § 20-7f (b).

"As previously stated, the express terms of the [acknowledgment form], which is a consumer contract, [provide] that . . . Boileau is responsible for all professional services submitted, to fully satisfy the bill for professional services rendered and to pay those charges not paid by health insurance. The [acknowledgment form] on its face violates . . . § 36a-573 by making . . . Boileau responsible for an 18 [percent] interest charge. The [authorization form] on its face also violates . . . § 42-150aa (b), which limits attorney's fees to 15 [percent] of the amount of any judgment [rendered]. . . . DeAngelo claimed 18 [percent] interest per year in the present action." (Footnotes omitted.)

We conclude that Boileau has abandoned his claims that the authorization form violates §§ 36a-573 and 42-150aa (b) as a result of an inadequate brief. "It is well settled that [w]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Nowacki* v. *Nowacki*, 129 Conn. App. 157, 163–64, 20 A.3d 702

(2011).

Boileau provides no analysis of the law and does not cite a single case in support of either one of his claims. Specifically, he fails to explain the applicability of § 36a-573 to the facts of this case, which involve a medical services provider imposing a default interest rate on an unpaid bill for services rendered. Furthermore, Boileau fails to explain how a bill for services rendered constitutes a loan within the ambit of the usury statutes,[17] or how a contractual provision providing for the collection of attorney's fees, which are permitted by statute, renders the entire contract illegal or unenforceable. Boileau's conclusory statements are insufficient to avoid abandoning these claims. Accordingly, we decline to review Boileau's claim as it relates to §§ 36a-573 and 42-150aa (b).

We now address Boileau's claim that the authorization form is illegal and against public policy because it violates § 20-7f (b) by providing that Boileau agrees to fully satisfy DeAngelo's bill for professional services rendered.

The following legal principles are relevant to our resolution of Boileau's claim. "Although it is well established that parties are free to contract for whatever terms on which they may agree . . . it is equally well established that contracts that violate public policy are unenforceable." (Internal quotation marks omitted.) *Dougan* v. *Dougan*, 301 Conn. 361, 369, 21 A.3d 791 (2011). "As a general rule, a court will [not] lend its assistance in any way toward carrying out the terms of a contract, the *inherent purpose* of which is to violate the law . . . ." (Emphasis in original; internal quotation marks omitted.) *Carriage House I-Enfield Assn., Inc.* v. *Johnston*, supra, 160 Conn. App. 246. Nevertheless, "[t]he principle that agreements contrary to public policy are void should be applied with caution and only in cases plainly within the reasons on which that doctrine rests . . . ." (Internal quotation marks omitted.) *Dougan* v. *Dougan*, 114 Conn. App. 379, 389, 970 A.2d 131 (2009), aff'd, 301 Conn. 361, 21 A.3d 791 (2011).

"Section 20-7f addresses balance billing. Typically, [b]alance billing [occurs] when a provider seeks to collect from [a managed care organization] member the difference between the provider's billed charges for a service and the amount the [managed care organization] paid on that claim. . . . [M]ost privately insured people are covered by [a managed care organization], which contracts with a network of providers to offer medical services to members. In return, providers agree to deliver services at a negotiated rate that is generally below their usual charges. Providers also agree to hold harmless (i.e., not to balance bill) members for the difference between the contracted rate and their typical billed charge." (Citations omitted; internal quotation marks omitted.) *Gianetti* v. *Rutkin*, 142 Conn. App.

641, 650–51, 70 A.3d 104 (2013). Accordingly, § 20-7f (b) "prohibits balance billing for medical services *covered under a managed care plan*. . . . In a typical balance billing case, the dispute arises after the insurance company has paid less than the full amount billed by the provider." (Emphasis added; internal quotation marks omitted.) Id., 654–55.

Boileau focuses on the following provision in the authorization form: "I fully understand that I am directly responsible to the Neuro-Spinal Center for all professional services submitted and agree to fully satisfy the bill for professional services rendered. I agree to pay you your regular charges for all medical services rendered to me. If so, I agree to pay those charges which are not paid by my health insurance." According to Boileau, this provision "negates . . . § 20-7f (b), thereby making the [authorization form] illegal and unenforceable." This claim is meritless.

First, the inclusion of the referenced provision does not establish that balance billing is the inherent purpose of the authorization form; see *Carriage House I-Enfield Assn., Inc.* v. *Johnston*, supra, 160 Conn. App. 246; and, Boileau has not identified a single charge billed by DeAngelo that would constitute balance billing. DeAngelo permissibly billed Boileau for his co-payments for each visit that was covered by Boileau's health plan, and DeAngelo's regular and customary charges for each visit that occurred after Boileau's benefits had been exhausted. Second, although Boileau argues that the provision, in accordance with his interpretation, violates § 20-7f, there is another completely plausible interpretation that would not violate the statute and is completely consistent with DeAngelo's obligations under § 2.03.12 (d), namely, that DeAngelo could bill Boileau directly for any charges that are not paid by Boileau's insurance, including copays, deductibles, and charges for services rendered after his benefits were exhausted or that were not covered by the health plan. "[I]f a contract provision has two possible constructions, by one of which the agreement could be held valid and by the other void or illegal, the former is to be preferred." (Internal quotation marks omitted.) *Marlborough* v. *AFSCME, Council 4, Local 818-052*, 309 Conn. 790, 808 n.15, 75 A.3d 15 (2013). Consequently, we reject Boileau's construction of the challenged provision, and we conclude that the authorization form is not illegal on its face.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] DeAngelo was misidentified as "D'Angelo" on the summons, and that misspelling has been retained in the case caption. We, however, use the correct spelling of his name throughout this opinion.

[2] Although Vaccaro filed the present appeal on March 22, 2017, and Boileau filed a cross appeal on March 31, 2017, Vaccaro and Boileau jointly submitted a single brief. After oral argument, we sua sponte raised the issue of whether Vaccaro, as a disinterested stakeholder, had standing to pursue the claims

raised in the jointly filed brief. On July 5, 2018, we issued an order granting Vaccaro permission to withdraw his appeal or file a supplemental brief giving reasons why his appeal should not be dismissed for lack of standing. Vaccaro withdrew his appeal on July 10, 2018, and, accordingly, only Boileau's cross appeal is before this court.

[3] Boileau does not claim that, as a result of providing the verification form on Boileau's thirteenth visit, DeAngelo is precluded from billing for the eleventh and twelfth visits in 2011.

[4] General Statutes § 52-484 provides: "Whenever any person has, or is alleged to have, any money or other property in his possession which is claimed by two or more persons, either he, or any of the persons claiming the same, may bring a complaint in equity, in the nature of a bill of interpleader, to any court which by law has equitable jurisdiction of the parties and amount in controversy, making all persons parties who claim to be entitled to or interested in such money or other property. Such court shall hear and determine all questions which may arise in the case, may tax costs at its discretion and, under the rules applicable to an action of interpleader, may allow to one or more of the parties a reasonable sum or sums for counsel fees and disbursements, payable out of such fund or property; but no such allowance shall be made unless it has been claimed by the party in his complaint or answer."

[5] "Actions pursuant to § 52-484 involve two distinct parts, the first of which is an interlocutory judgment of interpleader. . . . An interlocutory judgment of interpleader, which determines whether interpleader lies, traditionally precedes adjudication of the claims." (Internal quotation marks omitted.) *Vincent Metro, LLC* v. *YAH Realty, LLC*, 297 Conn. 489, 497, 1 A.3d 1026 (2010).

[6] Boileau filed a revised statement of claim on October 17, 2016, which the court accepted as the operative pleading.

[7] The authorization form was signed by Boileau in 2011, before the legislature enacted § 20-7h; see Public Acts 2012, No. 12-14, § 1.

[8] The court held a hearing on October 18, 2016, where Cigna appeared as an interested party seeking an order to seal certain documents containing proprietary information. In addition, the parties premarked exhibits and the court provided them the opportunity to offer opening statements.

[9] The total amount awarded to DeAngelo should have been $5784. Although we note the arithmetic error, neither party has challenged it. See *Guzman* v. *Yeroz*, 167 Conn. App. 420, 422 n.3, 143 A.3d 661, cert. denied, 323 Conn. 923, 150 A.3d 1152 (2016).

[10] During oral argument before this court, counsel for DeAngelo stated that he does not dispute that Boileau is a third-party beneficiary of the provider agreement. Because DeAngelo concedes this issue, we will assume without deciding that Boileau is, in fact, a third-party beneficiary of the provider agreement.

[11] Section 1.04 of the provider agreement provides in relevant part: "This [provider agreement] between Contracted Chiropractor and [American] includes this Agreement, the Operations Manual, the attachments listed [in this Agreement], and any amendments to such documents. . . . The attachments . . . are incorporated by reference herein. Any reference to the 'Agreement' shall include the [American] Operations Manual . . . and each of the attachments . . . as amended, unless otherwise specified." The operations manual was not admitted into evidence.

[12] The acknowledgement form is not the only written notification process described in § 2.03.12. Section 2.03.12 (a) requires written notification as to the member's financial responsibility for services that are ineligible for reimbursement before any services are provided. It provides that "the Initial Health Status form includes a section meeting the notice requirement." That form was not admitted into evidence. In addition, as noted previously in this opinion, § 2.03.12 (d) refers to the operations manual, also not admitted into evidence, as setting forth the appropriate notification process. The fact that there are different types of notification for different situations further confirms that the acknowledgement form is not intended for any purpose aside from "Non-Covered Services," pursuant to § 2.03.12 (b).

[13] Boileau also claims that DeAngelo billed him for massages, which are not covered under his health plan, without having Boileau sign an acknowledgment form. DeAngelo, however, did not bill Boileau for massages that were provided during visits that were covered by Boileau's health plan. DeAngelo only billed Boileau for all services provided during visits that exceeded Boileau's annual limit of ten chiropractic visits.

[14] General Statutes (Rev. to 2011) § 20-7f (b) provides: "It shall be an unfair

trade practice in violation of [General Statutes § 42-110a et seq.] for any health care provider to request payment from an enrollee, other than a copayment or deductible, for medical services covered under a managed care plan." Hereinafter, unless otherwise indicated, all references to § 20-7f in this opinion are to the 2011 revision of the statute.

[15] General Statutes (Rev. to 2011) § 36a-573 (a) provides in relevant part: "No person, except as authorized by the provisions of sections 36a-555 to 36a-573, inclusive, shall, directly or indirectly, charge, contract for or receive any interest, charge or consideration greater than twelve per cent per annum upon the loan, use or forbearance of money or credit of the amount or value of . . . (2) fifteen thousand dollars or less for any such transaction entered into on and after October 1, 1997. The provisions of this section shall apply to any person who, as security for any such loan, use or forbearance of money or credit, makes a pretended purchase of property from any person and permits the owner or pledgor to retain the possession thereof, or who, by any device or pretense of charging for the person's services or otherwise, seeks to obtain a greater compensation than twelve per cent per annum. No loan for which a greater rate of interest or charge than is allowed by the provisions of sections 36a-555 to 36a-573, inclusive, has been contracted for or received, wherever made, shall be enforced in this state, and any person in any way participating therein in this state shall be subject to the provisions of said sections . . . ." Hereinafter, unless otherwise indicated, all references to § 36a-573 in this opinion are to the 2011 revision of the statute.

[16] General Statutes § 42-150aa (b) provides: "If a lawsuit in which money damages are claimed is commenced by an attorney who is not a salaried employee of the holder of a contract or lease subject to the provisions of this section, such holder may receive or collect attorney's fees, if not otherwise prohibited by law, of not more than fifteen per cent of the amount of any judgment which is entered."

[17] In *Stelco Industries, Inc.* v. *Zander*, 3 Conn. App. 306, 308–309, 487 A.2d 574 (1985), this court adopted the rationale of the United States District Court for the District of Connecticut in *Scientific Products* v. *Cyto Medical Laboratory, Inc.*, 457 F. Supp. 1373, 1377–78, 1380 (D. Conn. 1978), "wherein the court, after a thorough analysis of this state's usury statute, concluded that 'Connecticut's courts have never expanded the usury statute to include any transaction which was not a loan of money, and, on the basis of what has been considered above, I do not believe that they would do so in this case if it was before them for decision. Furthermore, the fact that the Connecticut statute provides a particularly severe penalty—lenders who violate the statute shall forfeit not only all interest but also all the principal . . .—is an additional reason for not reading the usury statute more broadly than it is written.' . . .

" 'Both the judicial and legislative treatment of debts arising from the sale of goods on credit clearly indicate that Connecticut adheres to the traditional, historical and analytical views that sales on credit are not equated with loans and that the prohibition of usurious interest applies only to loans of money.' " (Citation omitted.)

In the present case, we fail to see how there could be any claim that DeAngelo loaned Boileau money. DeAngelo provided chiropractic services for which Boileau failed to pay. Boileau does not explain how the failure to pay a bill in a timely fashion converts the provision of professional services into a loan of money. Moreover, DeAngelo, in accordance with the letter of protection, agreed to forgo any payment from Boileau until Boileau had settled his personal injury action. Boileau's treatment with DeAngelo concluded on May 3, 2012, and Boileau settled his personal injury action in January, 2014. Neither the authorization form, nor the letter of protection permitted DeAngelo to charge Boileau *any amount of interest* during that time. Pursuant to the authorization form, Boileau would be charged interest only if he failed to pay his bill on time. Consequently, the 18 percent interest charge appears to be simply a late fee agreed to by the parties. We need not consider whether the late fee is an unenforceable penalty because that issue has not been raised, and, in any event, the court did not award DeAngelo any interest. The salient point though is that Boileau addresses none of these issues in his brief.